SAMUEL H. RICKEY, RESPONDENT, v. NEW YORK LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—71 S. W. (2d) 88.

St. Louis Court of Appeals. Opinion filed May 8, 1934.

*Jayne & Jayne* and *L. B. Henderson* for appellant.

*Harry J. Libby* and *Dan R. Hughes* for respondent.

McCULLEN, J.—This suit was brought by respondent, plaintiff below, for a refund of premiums paid and to recover permanent disability benefits under a life insurance policy issued to plaintiff by appellant, defendant below. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff in the sum of $708.60. Defendant appeals.

Plaintiff's petition charged that in March, 1920, in consideration of the payment by plaintiff to defendant of a premium of $65.44 annually, defendant executed and delivered to plaintiff its policy of insurance, whereby it insured the life of plaintiff in the sum of $1,000, payable to Emma S. Rickey, plaintiff's wife. The petition averred that $3.72 of the annual premium paid to defendant was an extra annual premium for total and permanent disability benefits under the policy, and that said extra premium was paid until plaintiff became sixty years of age, and thereafter the annual premium on said policy was reduced from $65.44 to $61.72.

The policy, marked exhibit A, was filed with the petition.

It was averred in the petition that the policy contained, among others, the following provisions:

"And the company agrees to pay to the insured one-tenth of the face of this policy per annum, during the lifetime of the insured, if the insured becomes wholly and permanently disabled before age sixty, subject to all the terms and conditions contained in Section 1 hereof."

The clauses of Section 1 of the policy, with which we are concerned on this appeal, were set forth in the petition as follows:

"Section 1.—Total and Permanent Disability Benefits. Whenever the company receives due proof, before default in the payment of premium, that the insured, before the anniversary of the policy on which the insured's age at nearest birthday is sixty years and subsequent to the delivery hereof, has become wholly disabled by bodily injury or disease so that he is and will be presumably, thereby permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit, and that such disability has then existed for not less than sixty days. . . .

"1. Waiver of Premium.—Commencing with the anniversary of the policy next succeeding the receipt of such proof, the company will on each anniversary waive payment of the premium for the ensuing insurance year, and, in any settlement of the policy, the company will not deduct the premiums so waived. . . .

"2. Life Income to Insured.—One year after the anniversary of the policy next succeeding the receipt of such proof, the company will pay the insured a sum equal to one-tenth of the face of the policy and a like sum on each anniversary thereafter during the lifetime and continued disability of the insured. . . .

"3. . . . . . . The annual premium for the total and permanent disability benefits is $3.72, and is included in the premium stated on the first page of this policy. Any premium due on or after the anniversary of the policy on which the age of the insured at nearest birthday is sixty, shall be reduced by the amount of premium charged for the disability benefits."

The petition further alleged that before the anniversary of the policy on which plaintiff's age at his nearest birthday was sixty years, and before a default in the payment of premiums under the policy, plaintiff became wholly disabled by bodily injury or disease so that he was and will be presumably thereby permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit, and that such disability had existed for not less than sixty days; that a notice of such disability was given to defendant and that liability under the policy was denied by defendant.

The petition averred that because of such disability defendant became liable to plaintiff, under the terms of the policy, for the sum of $100 on the 22nd day of March in each of the years 1928, 1929, 1930, 1931 and 1932.

The petition also charged that the annual premiums on the policy at the rate of $61.72 per annum, due on March 22nd in the years 1928, 1929, 1930, 1931 and 1932, were paid by plaintiff and received by defendant, whereas, under the terms of the policy said premiums were to be waived by defendant; that said premiums, totaling $308.60, were wrongfully detained by defendant, which sum, together with the benefits of $100 per year for five years, made a total of $808.60, for which amount plaintiff prayed judgment against defendant.

Defendant demurred to plaintiff's petition on the ground that the petition did not state a cause of action. The demurrer was overruled, whereupon defendant filed its answer, which contained a general denial and averred that under the terms of the policy the total and permanent disability benefits expired on March 22, 1925, and that since that date the clause providing for permanent disability benefits was of no effect. The answer alleged that due proof of total and permanent disability was not furnished to defendant as required by the policy, and expressly denied that plaintiff became or was totally and permanently disabled within the time prescribed by the policy.

Plaintiff's reply was a general denial of all the allegations contained in defendant's answer.

At the threshold of the case we are confronted by defendant's contention that plaintiff's petition failed to state a cause of action. The point urged by defendant in this connection is that plaintiff asks for a recovery for disability which was not averred to be the kind the policy contained.

We are unable to agree with defendant's contention. The petition plainly alleged that before the anniversary of the policy on which plaintiff's age at nearest birthday was sixty years, and before a default in the payment of premium, plaintiff "became wholly disabled by bodily injury or disease, so that he was and will be presumably thereby permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit, and that such disability has existed for not less than sixty days."

As will be seen from the foregoing excerpt, the petition pleaded plaintiff's loss in the language of the policy itself. Defendant did not file a motion to require plaintiff to make the petition more definite and certain. We think the petition sufficiently charges ultimate issuable facts to show a loss within the terms of the policy. The court properly overruled defendant's demurrer to the petition. [Jamison v. Continental Casualty Co., 104 Mo. App. 306, 78 S. W. 812.]

Defendant's next contention is that its demurrer to the evidence should have been sustained.

It is urged by defendant that plaintiff's evidence not only failed to show that he had sustained the kind of disability provided for in the policy, but on the contrary, showed that he had not sustained such a disability.

The evidence disclosed that on December 12, 1921, while plaintiff was alighting from a railway train on which he had been a passenger, he was thrown from the platform of a railroad station at Quincy, Illinois, and sustained severe injuries to his back and legs.

A. E. Lapp testified that he visited plaintiff at his home in October, 1925, at which time plaintiff was bedfast; that he visited plaintiff twice a week for a period of about ten weeks during that year and would find him in bed; that he and Ben McNeill, another witness, would walk plaintiff for exercises; that plaintiff would give out and they would have to place him in a chair; that after that period of time he saw plaintiff occasionally and that he was on crutches, and ever since that time plaintiff has used crutches.

Dr. Frank K. Roy, a witness for plaintiff, testified that for twenty-five years he had been practicing medicine at Clarence, Missouri, where plaintiff resided; that in 1921, after plaintiff had been injured, he visited plaintiff with a Dr. Daniels, who died a few years thereafter; that at the time the witness saw plaintiff he was at home in bed. The next time the witness saw plaintiff was in 1926, when plaintiff was at home in bed, complaining of severe pains in his limbs.

He saw plaintiff every day during that year until the last of September, and while plaintiff was more at ease so far as pain was concerned, plaintiff's "apparent paralysis" remained. When asked to describe the paralysis, the witness said:

"Well, it just seemed a lack of tone of the muscles in his limbs. He throws them like they are partially paralyzed. . . . he don't have complete control of them, it is necessary to use a crutch or cane or something to support him."

The witness testified that he ceased to see plaintiff professionally in September, 1926, and that in his opinion plaintiff was at that time permanently disabled. He stated that he would consider plaintiff's condition at that time wholly prevented him from engaging in any occupation for remuneration or profit.

Plaintiff testified that he was born on January 25, 1865, and therefore attained the age of sixty years on January 25, 1925. He described the manner in which he was injured in getting off a railroad train at Quincy, Illinois, on December 12, 1921. The injury he then received required him to go to bed. He said that Dr. Daniels, since deceased, treated him every day for about two weeks. At the end of two weeks he was able to get out of bed and could walk with a cane; that ever since receiving the injury he has been required to use one or two crutches a good part of the time, and that he cannot get around or go any distance without the aid of either a cane or a crutch. He testified that at the time of the trial he thought he was getting worse. Referring to one of his feet he said, "I have never been able to move it off of the floor. When I walk I drag the sole off there." He said that Dr. Daniels treated him from time to time until Dr. Daniels died, five or six years prior to the trial; that after the death of Dr. Daniels he had Dr. Roy and Dr. Caldwell treat him, and that he also saw a specialist at Canton, Missouri. He said that before receiving the injury he could walk any place, without any aid, but that since the injury he has to have a cane or a crutch, or both, and that sometimes in order to go about, he has to use a wheel chair.

With respect to his occupation plaintiff testified that in 1921, at the time he sustained the injury mentioned, his business was buying furs in the winter time, buying wool when the season came, and that through the summer he painted; that he was a painter by trade, having been in that trade for thirty years. He said the fur season usually opened about the 15th of November, and closed the 15th of January, and that the wool season ran longer. He testified that from the date of the injury in 1921, he has not been able to climb a ladder to do work as a painter. In this connection he testified:

"I paint a little now standing and lean on my crutch and cane, and as far as I can reach off of the ground. Taking contracts I have to hire labor to help me. I have a boy if the job is small I got to do

the work and I paint some off of the ground. If it is any size some-body helps me. Since my injury in 1921, I just go out and take a job and do what little I can do and see that it is done. In other words I now have to employ men to do the painting and I supervise the job, painting such material as I can paint on the ground.''

Plaintiff stated that before he was hurt he was able to handle furs and bales and sacks himself, but after he was hurt his customers had to come to his house,'help him out to the yard so that he could look at the furs, and that he would sit in a chair while his customers would count the furs and put them on a box; that the customers had to help him back to his house, where he would figure up the price for the furs and give the customers a check; that he would hire a man to come to help his son sack the furs and take them to the train. He testified that he went out on the road on trips to buy furs, but that he would have to be taken in a wheel chair to the train, and when he would get off the train at his destination, if the distance was not too great, he could ''worry along on his crutches,'' otherwise, it would be necessary for someone to come to get him. He testified that when he went to hotels, it was necessary that he be furnished a bed or cot on the lower floor. When asked as to what extent he was able to buy furs after he received his injury, plaintiff answered:

''The only reason I bought furs after I was injured was because I had to live. I suffered pain as I went about my work inspecting furs. I was only able to buy them. About all I could do with respect to buying furs was to pay them and grade them. I even took a man from my home with me from Shelbina to come to help me sack and handle them.''

Testifying further in this connection plaintiff said:

''Well, I had lots of customers. I did an awful sight of business there at home, they brought it to me. I went out on the territory and road some, but hardly went to a place without I knew what they had—to some of my old customers. After I was injured the furs that I bought at my home were brought to me by my old cus-tomers.' I graded and sorted them and employed someone else to do the other work connected with it.''

On cross-examination plaintiff testified that during the fur season of 1926-1927, and the season of 1927-1928, he worked for Kappel Bros. as a buyer; that altogether he worked for that firm five or six winters; that he was with Helman Bros. during the season 1928-1929; that the first winter he worked for Kappel Bros. his ''com-pensation was something like $150.00,'' and that in his last season with that firm he was on a commission basis.

Plaintiff's testimony on cross-examination further showed that he was with the firm of Ephram & Cushman, of Cedar Rapids, during the buying season of the year before he went with the Kappel firm

in 1925-1926. Following the season of 1928-1929 he worked for the Federal Fur & Wool Company, on commission, ten days and drew as commission "somewhere around $150."

On redirect-examination, explaining the delay in sending his proof of loss to defendant, plaintiff said that he mailed the proof of loss to the company on November 28, 1927; that it was about four years after he received his injuries before he knew that his policy provided for disability benefits; that an agent of defendant called his attention to the disability clause.

Charles S. Hicks, a witness called by plaintiff, testified that he was engaged in the fur and wool business at Monroe City, Missouri; that he was acquainted with plaintiff and had known him since 1917; that prior to the time plaintiff was injured in December, 1921, plaintiff would come to the place of business of witness for the purchase of furs and plaintiff would grade and help sack them. The witness testified that plaintiff came to his place of business in 1926, 1927, 1928, 1929, and possibly 1930; that plaintiff also made occasional trips in 1922, 1923 and 1924; that on these occasions he and one of his helpers would assist plaintiff in getting on and off the train; that in the matter of purchasing furs they would prepare a table for plaintiff and throw the furs on it, give plaintiff a chair and that he usually sat in the chair and would grade the furs, which would be placed in different piles and lots; that plaintiff would price the different grades and lots after they were assorted and graded; that after plaintiff's injury in 1921, plaintiff did no other service or labor than directing into what piles the furs should be placed. The witness stated that he never saw plaintiff after he received his injury without a crutch or cane, except when he was sitting down.

On cross-examination this witness said that during the buying season plaintiff called once or twice a week; that when they wanted to sell plaintiff a load of furs they would get into communication with him, and when they had large lots, plaintiff would come, as requested. Referring to plaintiff as a trader, the witness said: "He was a fair trader. There have been times when he bought from six to eight thousand dollars worth from us." The record does not show when, or for whom, or under what circumstances plaintiff made the last mentioned purchases.

Grover M. Wood testified that he was a farmer engaged in the wool, fur and hide business for fifteen or twenty years at Dunkins Bridge in Monroe County; that prior to the time plaintiff was injured plaintiff "would go right into the matter and take up the furs; would handle the sacks and would load it up and take it when he got it bought. After he was injured the acts of labor that I saw him do in the buying and taking up of furs was almost nothing. After he received this train injury I continued to sell him furs. I made the sales

at his home in Clarence. I have gone there with loads of furs to sell. Me and Mr. Wedding would assist him from the house to the barn. . . . we would lay the furs on the floor or put them up on the coop and he would look at them; . . . After he had finished he would make an offer for the different piles or lots. Mr. Rickey did no other act but simply to examine the furs and direct us what piles it should be placed in."

The witness stated that they had not sold plaintiff any furs since 1925 or 1926.

Dr. R. L. Caldwell, an osteopathic physician of Shelbina, Missouri, was called as a witness for plaintiff and testified that he treated plaintiff in October, 1926; that plaintiff was carried to his office in a chair. The witness stated that from the history of plaintiff's case and the examination he then made, he found plaintiff suffering with paralysis of the lower limbs due to injury in his spine. The witness said:

"In my examination I endeavored to find out what produced paraplegia and my conclusion was that an injury to the lower part of the spine close to the fourth or fifth lumbar vertebra caused it. . . . After I diagnosed the case I took him to Dr. Waggoner at Canton, Missouri, an osteopath, who is also a graduate of Yale Medical School and who is regarded as an expert. . . . I was present at the examination and in conjunction with Dr. Waggoner made a second diagnosis. He just verified my previous diagnosis. Paraplegia is generally caused by an injury to the spine. It is a pressure on the spine itself. If the pressure is so great it will cause paraplegia or it can be so slight that it will be a gradual worry on the spine causing paralysis later on. I found paraplegia present in both of Mr. Rickey's limbs. That indicates to me, as a medical man, an injury to the spine itself, not to the nerves. The injury would have to be there to affect both limbs. It affects both motor and sensory nerves. It causes a feeling of numbness and also a sensation of pain and affects the ability of a man to work . . . as far as using his limbs is concerned."

The witness further testified that he treated plaintiff from October 18, 1926, to February 27, 1928, but as a whole he was not able to improve plaintiff's condition. With respect to plaintiff's condition, the witness testified:

"I would say that in October, 1926, he was totally and permanently disabled. From my examination I would say his trouble dated back to the time of his injury. I would say that the condition that I found is permanent."

On cross-examination Dr. Caldwell testified that it would be impossible for plaintiff to do any work that, "required movement of his limbs," but that his condition would not affect him mentally, or af-

fect his arms, and would not prevent his doing work that "did not require the movement of his limbs."

On redirect-examination Dr. Caldwell, testifying with respect to plaintiff's duties as a painter, said:

"I would say that he was totally disabled from climbing ladders and scaffolds and climbing to heights."

Dr. I. A. Keyte, an osteopathic physician of Clarence, Missouri, testified that he had treated plaintiff professionally at intervals since 1921, after plaintiff's accident at the railway station. He saw plaintiff at his home, where plaintiff was in bed. After a number of months plaintiff would go to the witness' office. With respect to plaintiff's condition, the witness said:

"I think he is getting worse. I think he is permanently disabled from any manual duties. I don't think he could do any of the usual duties of a house painter or painter of any kind. He might have partially performed the usual duties of a fur buyer but he couldn't go from place to place or do like he always bought it. He first went out in a wheel chair. He finally got on crutches and a cane and hobbled about. He is gradually getting worse."

The witness testified that plaintiff had a bad spell along about August or September of 1924. Concerning the condition of plaintiff in 1924, he said:

"Mr. Rickey might have been able to use his arms a little or something like that and maybe got around and contracted a little work or something of that kind but he couldn't work with any safety. He was totally and wholly and permanently disabled from discharging the usual duties of a house painter and a fur buyer."

Mrs. Samuel Rickey, plaintiff's wife, gave testimony corroborating the testimony of her husband with respect to his condition throughout the years following his injury in 1921. She said that plaintiff used a wheel chair off and on; that in connection with the buying of furs, plaintiff had to have help more or less since 1922; that in connection with plaintiff's work as a painter, plaintiff "has painted some since the injury, but it is hard. It was hard for him to do. He had to have something to support him. He couldn't reach up or anything like that. I have a son that works with his father. . . . He had something to do with assisting his father in the fur business as well as painting."

She testified that plaintiff has not done any of the chores around his home since the time he was hurt in 1921. Concerning the extent of plaintiff's activities in connection with painting, Mrs. Rickey said: "He gets the job of painting by contract and my son does the work with other help."

A number of other witnesses gave testimony for plaintiff, which was to the same general effect as that of the witnesses whose testimony we have outlined above.

At the close of plaintiff's evidence defendant offered a peremptory instruction in the nature of a demurrer to the evidence, asking the court to direct a verdict for defendant. The court refused to give such instruction. After saving its exceptions to the action of the court, defendant introduced evidence showing that plaintiff, at various times in the fur seasons of the years for which he claimed disability benefits, received compensation for services as a fur buyer. During some of the seasons he received $50 per week and expenses some weeks, while during other seasons he was paid on a percentage basis.

Plaintiff admitted he had received compensation for services as a fur buyer, as shown by defendant's evidence. On the other hand, defendant's evidence concerning these transactions was not contradictory of plaintiff's evidence as to the paralyzed condition of plaintiff's legs at all times during the years involved, nor did such evidence on the part of defendant contradict plaintiff's evidence wherein it showed that plaintiff was aided by his friends and customers in rendering such services.

At the close of all the evidence defendant again offered and asked the court to give an instruction directing the jury to return a verdict for defendant. The court refused to give such instruction.

In passing upon defendant's demurrer to the evidence, it is our duty, under the rule long established, to take plaintiff's evidence as true, give plaintiff the benefit of every reasonable and favorable inference arising therefrom, and disregard defendant's evidence wherein it contradicts plaintiff's evidence. Keeping this rule in mind and applying it to the facts in evidence, we come now to the main question presented for our determination: Did plaintiff show that he was "wholly disabled" so that he was "permanently and continuously prevented from engaging in any occupation whatsoever for remuneration or profit" within the meaning of the contract of insurance?

There are certain well established primary rules of law for the construction of written contracts. These rules are to be applied for the purpose of ascertaining from the language used in the contract, the manner and extent to which the parties thereto intended to be bound thereby. One of these rules is stated thus:

"The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent." [13 C. J., sec. 482, p. 521.]

Courts everywhere have repeatedly declared and applied the general rule that it is not within the province of the court to alter a contract by construction, or to make a new contract for the parties. It is unnecessary to cite cases to support the familiar rules that a court's duty is confined to the interpretation of the contract which the parties have made for themselves, without regard to its wisdom or its folly, and that a court may not read into a contract, words which the contract does not contain. Another general rule requires that:

"A contract must be construed as a whole, and the intention of the parties is to be collected from the entire instrument and not from detached portions, it being necessary to consider all of its parts in order to determine the meaning of any particular part as well as of the whole." [13 C. J., sec. 486, pages 525, 527.]

Having in mind the foregoing rules, can it be said that plaintiff, by his extraordinary efforts to "make a living" for himself and family, thereby furnished evidence which, as a matter of law, will defeat his claim for disability benefits?

At the time plaintiff sustained the injuries which resulted in paralysis of both his legs, he was a painter by trade, having been a painter for many years prior thereto. After the painting season was over in each year, for two months during the winter, while the fur season was on, he engaged in the occupations of fur buying and wool buying. The evidence shows that before meeting with the accident at the railway station in 1921, plaintiff was engaged in the occupations mentioned, as normal men usually engage therein. After his injury he was required to use crutches or a cane to move from place to place. It is, therefore, clear that after plaintiff's injury he could not carry on his trade as a painter and do the things which a normal, average painter could do and must do if he is to perform the duties of such occupation. He could not climb ladders; he could not work upon a scaffold; in fact he could do no part of painting work which would require him to reach. It is a matter of common knowledge that persons who "engage in the occupation" of painting, are required to reach to the right and to the left with their brushes in applying paint, and they must be able to do various kinds of climbing. Plaintiff, after his injury, could do only such small portions of the work usually done by a painter, as he could reach while resting on his crutches on the ground, or upon a floor. It will hardly be contended by anyone that a man with both his legs paralyzed could "engage in the occupation" of painter in the normal and customary manner that the average painter "engages" in such occupation. Could plaintiff, or anyone, reasonably expect any employer of painters to give to plaintiff, in his crippled condition, with both legs paralyzed, employment as a painter? To state the question is to answer it in the negative.

With respect to the buying of furs, the evidence shows that prior to his injury in 1921, plaintiff could and did move about in connection with that occupation in the ordinary, normal and natural manner of persons possessed of sound limbs. After he sustained his injuries he could no longer walk to the railroad station and get on a train; he could no longer alight from a train and walk to his destination; he could no longer go to the various fur dealers and go among the furs to do the sorting and grading himself, as he had formerly done. It was necessary that he be helped into automobiles, helped on to trains, helped to alight from trains and carried to the place where the business was to be transacted. He could not sack the furs, nor carry them to the places of shipment as he had formerly done. The evidence shows clearly that plaintiff was not able to engage in the occupation of fur buyer in the normal, natural and customary manner in which he had formerly engaged in that occupation. He was unable to perform many of the important duties of such occupation. The same is true with respect to plaintiff's inability to engage in the occupation of wool buying.

Can it be said from the language of the contract which we have quoted above, that it was the intention of the parties thereto that even though plaintiff sustained an injury which paralyzed both his legs and made it impossible for him to engage in his several occupations in the normal, natural and customary manner of the average person engaged in such occupations, that his claim should be defeated because his friends and customers, out of the kindness of their hearts, and because of past associations with him, performed for him many of the important duties of such occupations, which he was unable to perform for himself? We do not believe that any such narrow and unreasonable construction should be put upon this contract.

Defendant earnestly insists that it is entitled to stand on the terms of its contract and that if plaintiff, during the period involved, was able to engage "in any occupation whatsoever for remuneration or profit," then he clearly was not entitled to a recovery under the contract.

It is argued that plaintiff himself gave testimony which showed that he did continue his business because he had to make a living. This argument is based upon the view that a literal construction should be given to the terms of the contract. If we were to adopt such a view it would lead to an absurd result. To adopt such a view would require the holder of a policy containing such a clause to prove that he was in a state of absolute inertia to bring himself within the terms of the policy. It would render the disability clause of the policy meaningless in so far as the intention of the parties is concerned, as evidenced by their entering into a contract of insurance. If such a construction were to be adopted and applied to cases of this character,

it would mean that an insurance company could properly receive a premium from a policyholder for a benefit which it could only, in exceptionally rare and extreme cases, be required to pay.

In a very well considered case decided by the Kansas City Court of Appeals, the plaintiff therein brought suit to recover on a benefit certificate which provided:

"Within a period of ninety days after receipt of satisfactory proof, of the permanent and total disability of the said member, which renders him unable to carry on or conduct any vocation or calling, and the surrender of this certificate, one-half the amount that would have been due beneficiary in case of the member's death, will be paid said member in full."

In that case the evidence showed that plaintiff's vocation was that of a farmer. His right leg had been seriously afflicted. The evidence tended to show that the condition of the leg was permanent and that it would be necessary to amputate it. It was shown that the plaintiff directed work to be done on his farm and that he performed some of the farm labor himself. He drove the wagon while loading and unloading corn and in hauling coal from a mine. He also aided to some extent in cultivating a crop of 2,000 bushels of pickles. He plowed some and helped in the cutting and shocking of oats. The defendant in that case contended that the plaintiff therein was not disabled from carrying on the business of the farm and that the evidence showed his disability was not such total disability as the terms of the policy required, to entitle him to the indemnity claimed. In passing upon this contention the court said:

"But we are unwilling to adopt such a doctrine, the effect of which would be, practically, to reduce all such contracts to nullities and to make them the instruments of extracting dues from policy holders without creating any liability on the part of the insurers. Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation—some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoestrings or lead pencils, or follow some similar calling, in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. . . . [Foglesong v. Modern Brotherhood of America, 121 Mo. App. 548, 552, 97 S. W. 240.]

In James v. Casualty Co., 113 Mo. App. 622, 88 S. W. 125, the policy involved therein defined the term, "wholly disabled" by the

use of the words, "that the insured is totally unable to perform any part of the duties pertaining to the occupation above stated." The plaintiff therein was a wholesale and retail merchant. There was evidence showing that he went to his place of business almost daily; that he signed checks, approved orders for goods and dictated letters. There was also evidence that he went on a trip to New York to buy goods, but he could not do many of the principal matters pertaining to his business as a queensware merchant. He could not get about the store and was compelled to sit about his office in a crippled condition. His efforts at business in New York were hampered by his injury. He was compelled to travel about in a cab and had to be accompanied by someone to assist him.

In construing the language above referred to the court, after reviewing the evidence, said:

"We therefore hold the contract to mean, not that the assured was rendered absolutely and literally unable to perform any part of his occupation, but that he was disabled from performing substantially the occupation stated in the policy. [James v. Casualty Co., 113 Mo. App. 622, 628, 88 S. W. 125.]

The contention of defendant in the above mentioned James case was that the policy itself defined what was meant by "wholly disabled" by requiring that the assured must be "totally unable to perform any part" of his duties. Answering this contention, the court said:

"When parties enter into a contract it must be assumed that they intended that which in certain events or contingencies would mean something and have some effective force. . . . It cannot be that the parties intended that before an assured could recover on the policy he should lie the full period of his injury in a state of coma. To interpret the clause in its contractual sense as defendant seeks to have us do, would render the contract utterly useless to an assured and would be nothing short, practically speaking, of collecting a premium without rendering a consideration." [James v. Casualty Co., supra.]

It will be noted that in the case at bar the language of the disability clause of the policy does not require that plaintiff must prove that he is unable to perform or engage in any part of any occupation whatsoever to be entitled to benefits, as did the policy in the James case, supra. There are stronger reasons therefore in this case, because of the broader language in the disability clause, than there were in the James case, for refusing to give to the contract the narrow and restricted construction contended for.

The contract herein must be given a practical reasonable construction. When defendant insured plaintiff against disability which would prevent him from "engaging in any occupation," and plaintiff accepted and paid for such insurance, we must conclude that they in-

tended that the words just quoted were to be given their ordinary, reasonable and customary meaning. When we say that a person is engaged in the occupation of painter, or is engaged in the occupation of fur buyer, we ordinarily and customarily have in mind that the person referred to is able to perform, and therefore is performing the duties usually performed by persons engaged in such occupation.

In this case it cannot be said that plaintiff was capable of "engaging in the occupation" of painter or fur buyer in the face of the evidence which showed that he was not able to perform many of the important duties of such occupations. If, for purposes of analysis, we put aside for the moment the assistance given to plaintiff by his customers and friends, who performed for him many of the important duties of the occupations mentioned, which the evidence shows plaintiff was not able to perform, it certainly cannot be reasonably said that plaintiff was engaging in the occupation of painting or fur buying in the ordinarily accepted sense in which persons customarily engage in such occupations.

The policy in this case insured plaintiff against his own permanent total disability, and the evidence shows that if he had been left to his own resources, his own strength, and his own ability, and had refrained from accepting the services of his customers and friends, he would have been forced to remain at home in a condition of helplessness in so far as engaging in such occupations, in the ordinarily accepted meaning would be concerned.

There is evidence in this case which, if believed shows that plaintiff is and has been since 1921, more or less paralyzed in both legs, and the fact that plaintiff, by extraordinary and painful efforts, coupled with the aid of customers and friends, earned some money, should not be permitted to divert our attention from plaintiff's actual physical condition, which, after all, is the vital matter involved herein under the terms of the insurance contract.

We are of the opinion that the evidence was sufficient to warrant the trial court in submitting the case to the jury for their decision.

Defendant complains that plaintiff's instructions authorized the jury to find for plaintiff without requiring them to find that plaintiff had, before the anniversary of the policy nearest his sixtieth birthday, became wholly disabled within the express meaning of the policy.

It is a sufficient answer to this contention to point out that plaintiff's instruction No. 1 required the jury to find, among other things, as a prerequisite to a verdict for plaintiff, that plaintiff, "prior to the date he became sixty years of age, at his nearest birthday, became wholly disabled by reason of bodily injury or disease so that he was . . . thereby permanently and continuously prevented from engaging in any occupation whatsoever . . ."

The foregoing excerpt from the instruction shows that defendant's point is not well taken.

Defendant next complains of the refusal of the court to give instructions which it offered.

Instructions G and H, offered by defendant, were based upon defendant's theory that the disability clause of the contract should be given a narrow and literal construction. Under the views which we have expressed herein, the instructions in question were clearly erroneous and were properly refused.

By Instruction 1, defendant sought to have the court tell the jury that plaintiff must prove by the greater weight of the evidence that he furnished defendant reasonable proof that he was disabled prior to March 22, 1925, and unless he had so proven, their verdict must be for defendant. In view of the other instructions given in the case covering this matter, we believe the court committed no error in refusing the instruction.

We find no reversible error in the record and the judgment is, therefore, affirmed. *Becker, J.,* concurs; *Hostetter, P. J.,* not sitting.