JOHN BURNS, RESPONDENT, v. AETNA LIFE INSURANCE COMPANY, A CORPORATION, APPELLANT.—123 S. W. (2d) 185.

St. Louis Court of Appeals.   Opinion filed January 3, 1939.

S. R. Redmond and Henry D. Espy for respondent.

Jones, Hocker, Gladney & Grand and Lon Hocker, Jr., for appellant.

McCULLEN, J.—This suit was brought by respondent as plaintiff below against appellant as defendant to recover disability benefits under a group policy of life insurance which was issued by defendant to an organization known as Swift & Company Employes Benefit Association. A trial before the court and a jury resulted in a verdict and judgment in favor of plaintiff against defendant in the sum of $2000, with interest added, making a total of $2117. After an unavailing motion for a new trial, defendant brings the case to this court by appeal.

Plaintiff's petition alleged that defendant issued to Swift & Company, a large industrial concern, its group policy insuring all the employees of said Swift & Company, being group policy No. 3380; that, in compliance with the terms of said group policy, there was issued to plaintiff an individual certificate No. 176113 in the sum of $2000. Said certificate was attached to the petition and made a part thereof as plaintiff's Exhibit A. Plaintiff's petition further alleged that, under the terms of the group policy and individual certificate, defendant promised to pay plaintiff $2000 in the event of plaintiff's total disability.

Plaintiff further alleged that, on February 21, 1936, while he was in the employ of Swift & Company and while said group policy was in full force and effect, plaintiff became wholly and permanently disabled and will remain so until he dies; that he is less than sixty years old; that demand was made by plaintiff upon defendant for benefits due under the policy, but defendant refused to pay. Plaintiff prayed judgment for $2000 with interest and penalties for vexatious refusal to pay.

Defendant's answer contained an admission of the issuance of the group policy and the individual certificate, coupled with a general denial. For further answer, defendant alleged that the group policy and certificate constituted contracts executed in the State of Illinois,

and that they were governed by the laws of that State. Defendant further alleged that, under the laws of the State of Illinois, plaintiff was not totally and permanently disabled. Plaintiff's reply was a general denial.

The evidence discloses that plaintiff went to work for Swift & Company in 1931, and worked for that company until February 21, 1936. Shortly after he began work for Swift & Company, plaintiff became a member of the Swift & Company Employes Benefit Association. The group policy of insurance, under which plaintiff, as a member of Swift & Company Employes Benefit Association was insured, provides as follows:

"If any member before attaining the age of sixty years and while insured hereunder, becomes totally disabled and presumably will thereafter during life be unable to engage in any occupation or employment for wage or profit, or shall meet with the entire and irrecoverable loss of the sight of both eyes or the use of both hands or both feet or of one hand and one foot, such member shall be deemed to be totally and permanently disabled. Upon receipt at the Home Office of the Company, during the continuance of insurance on such member of satisfactory evidence of such disability, the Company will pay the amount of insurance in force upon such life at the time such disability commenced, in lieu of all other benefits provided for on such life under this policy, by that one of the following optional methods that shall be designated and requested."

The evidence shows that the group policy was delivered to Swift & Company Employes Benefit Association in Chicago, Illinois; and that the certificate issued under said group policy of insurance was delivered to plaintiff in East St. Louis, Illinois.

It further appears from the evidence that, while the group policy of insurance and certificate were in force and effect during the summer of 1934, plaintiff received an injury to his right wrist in Swift & Company's plant while he was lifting a frozen hog carcass from a conveyor chain to a table where it was to be butchered. In describing the manner in which he sustained the injury to his wrist, plaintiff testified:

"Whilst I was lifting one of those big hogs the roller—they bend the roller lots of times when they are killing them—they bend the roller, and the thing that pulls the roller around, it catches behind the roller, and by being bent it goes over and misses. And one of those big hogs come around with the roller bent, and I didn't notice it was bent—in fact, I didn't take time to look up—and I grabbed it and shot it up, and just as I stuck my arm under it the thing turned the roller loose and it flopped back and hit my wrist and fractured it."

For about nine months after sustaining said injury, plaintiff was treated by Dr. Gowan, who was employed by Swift & Company. During that period of treatment, which consisted of applying liniment

and putting plaintiff's wrist in a splint, plaintiff was given light work to do, which he described as "pill around." During the month of May, 1935, plaintiff complained that he was wholly unable to use his right hand because of the injury to his wrist, and Dr. Gowan had plaintiff's hand X-rayed at St. Mary's Hospital in East St. Louis, Illinois. A day or so thereafter, upon his return to the plant, plaintiff was sent to Barnes Hospital in St. Louis where, on May 27, 1935, an operation was performed on his right hand by Dr. Glover H. Copher, who removed the right carpal semilunar bone. On July 20, 1935, plaintiff returned to work at the plant where he was given light work, such as oiling machinery and washing floors with a hose, and continued working at that kind of work until February 20, 1936. He was discharged from his employment on February 21, 1936, but no deduction was made from his weekly pay for the payment of his premium contribution on the group policy of insurance after February 14, 1936.

Under the heading "Individual Terminations," the group policy of insurance provides:

"The insurance of any member insured hereunder may at the option of the Association be terminated by it whenever said member for any reason whatsoever ceases to be in the employ of Swift & Co., and/or its subsidiaries or affiliated companies, or at any time thereafter. If employment of any member insured hereunder ceases, but membership in the Employees Benefit Association is continued thereafter, the insurance shall be continued until the member's name is removed or canceled from the Group Life Insurance records of the Employees Benefit Association. The insurance of any member insured hereunder shall automatically be terminated upon withdrawal from or termination of membership in Swift & Company Employees Benefit Association, or upon failure of the member to make the required premium contribution, or upon discontinuance of the Group Policy by Swift & Company Employees Benefit Association."

On March 19, 1936, Dr. Robert M. Scott, acting on behalf of plaintiff, submitted proofs of loss in support of plaintiff's claim for disability, which was denied by defendant.

Defendant contends that the trial court erred in failing to give and read to the jury its instruction in the nature of a demurrer to the evidence offered at the close of the testimony; and asserts that there was no evidence to show that plaintiff was totally and permanently disabled within the meaning of the policy on and prior to either February 20, 1936, or February 21, 1936. It thus becomes necessary to review the evidence.

Plaintiff's evidence shows that he met with two accidents in 1934 while working for Swift & Company at its plant. In one accident he sustained the injury to his wrist, and the other resulted in an injury to his back.

Plaintiff testified that he was thirty-three years old at the time of the trial; that he had a third garde grammar school education. It appears from plaintiff's evidence that, in June, 1934, while he was lifting one of the big hogs on a platform which was slippery, he slipped and wrenched his back; that he went to the doctor and the doctor gave him pills for the pain in his back. Speaking of the injury to his back, he said: "I have been bothered with it ever since." Plaintiff further testified that his wrist hurts him all the time; that "when it clouds up it hurts worser, and it hurts me all back in my shoulder, in my shoulder it hurts, and if I move the wrist it hurts"; that he has been suffering with his wrist ever since the operation. As to his physical condition and inability to work at the time of the trial, plaintiff testified:

"I have to get up four or five times at night to urinate, and if I walk any distance my back hurts me worser; it makes me feel weak all the time. In fact, I am not strong at all and I feel sick and I am bothered with the misery in my arm all the time. Since I left the company in February, 1936, I tried to get work in several places, but was refused. I was hired a couple of times, and when I went in for examination was turned down. I got a job helping a fellow on a coal truck, carrying coal, which I tried to do, but the coal was too heavy and my back would hurt and my wrist would swell up. I worked on that job two days, but had to give it up on account of my condition. I also had a porter job at the barber shop. I undertook to shine shoes, but couldn't do that because whenever I jerked the rag over the men's shoe my wrist would swell and I couldn't hold the rag. It was also my duty to keep the barber shop clean, but I was unable to wring the mop and was let out of this work. The condition I am suffering from was present before I was let out and ever since I have been let out, and I am no better."

On cross-examination plaintiff testified that he is able to write with his right hand and write his name; that he is able to eat with his right hand; that he can lift a small glass to drink, and can dress himself with his right hand; that he exercised his wrist as fully as he could, but that he cannot shine shoes; that he didn't know whether he could sell papers because he never sold papers and didn't know anything about it. Asked if he was able to run errands, he said he didn't know what that was; that there was nothing wrong with his legs except they hurt him sometimes. He could not remember when they started hurting; that he went to Dr. Scott in June, 1935, for treatment; that Dr. Scott treated his back and wrist. In this connection plaintiff testified:

"I don't know whether it is my kidneys which trouble me or not. I have to get up at night to urinate. I have been bothered with this a good while."

Plaintiff further testified that he had never tried running errands

as a messenger boy and saw no reason why he couldn't walk from one place to another to deliver messages, "except walking is against me. I can't walk too far." He further testified that "any walking makes my back hurt."

Upon being recalled to the stand prior to the close of plaintiff's case, plaintiff testified that he was not able to walk eight or ten block with ease; that he could walk five or six blocks without feeling the effects of it, but that his back begins to hurt and that he gets weak and has to sit down; that, if he stands for any period of time, the small of his back begins to hurt him and seems like it is dropping loose, and makes him weak and nervous; that he feels better sitting down; that, as soon as he stands up again, it immediately starts hurting worst; that his back is already hurting but that if he stands it gets worse; that he can stand about forty or forty-five minutes before his back throbs, but if he sits down it is relieved some. In this connection plaintiff testified:

"The majority of my time I spend sitting down, for I am not able to run, and the least walking I do is against me. The pain resulting from walking or standing goes through my shoulders and arms. I have had no business experience."

Dr. William Edward Allen, a radiologist, testified that he made an X-ray of plaintiff which represented an examination of plaintiff's right wrist as well as an examination of the left wrist for comparison. Testifying from the X-ray films, the witness stated that plaintiff's right wrist showed a deformity of the radius on its ulnar aspect; that a bone called the *os lunatum* had been removed; and that bony fragments appearing in the X-ray films probably represented remnants of the removed bone; that the radius was ragged and there were fragments there; that fragments and raggedness mean the same thing; that constant use of the right wrist would cause irritation. In this connection the doctor was asked to explain what effect the fragments would have on the use of the hand, and answered:

"In my opinion, I think they will have a marked effect on the function of the joint because of the constant irritation of the smooth articular surface from these fragments of bone every time the patient attempts to use the wrist."

Dr. William H. Sinkler, a physician and surgeon, testified that he examined plaintiff in December, 1936; that, from his examination, he reached the conclusion that plaintiff was suffering from a sacroiliac sprain and a disability of his right wrist of about eighty to eighty-five per cent. The witness testified that, in his opinion, the disability of plaintiff's wrist was permanent; and that the sprain in plaintiff's back was probably permanent.

Dr. Robert M. Scott, a physician and surgeon, testified, as a witness for plaintiff, that he treated plaintiff from August 25, 1935, up until the time of the trial; that, at the beginning of his treatment,

plaintiff complained of pains in the right wrist, back, right shoulder, and also frequency and urgency of urination; that he saw plaintiff twice during 1935; that, in February, 1936, plaintiff came to him with the same complaints; that plaintiff had a marked high blood pressure; that he made an urinalysis of plaintiff at that time which disclosed casts and alubumen in the urine; that later plaintiff began to develop pains in his back; that the pains became very severe and the infrared ray lamp was applied. The witness gave it as his opinion that there was from eighty to eighty-five per cent. limitation of motion in plaintiff's right wrist, which he stated was a permanent condition. He also gave it as his opinion that the condition of plantiff's back and kidneys described by him is permanent.

On cross-examination, the witness testified that the proofs of disability which he had presented to defendant in March, 1936, contained the following: "Give present condition of patient," and the following question: "Has patient been able to engage in gainful occupation?"; and testified that he wrote, in answer to the above, "Patient is unable to do any heavy work making use of hand;" and that he also wrote the following in his answers: "Patient is unable to use right hand, ankylosis; also complained of backache." The witness further testified that said proofs contain the question: "If so, on what date was such disability?"; and that he answered: "January, 1936." Dr. Scott further testified that the answers to the questions as shown above were still his opinion at the time of the trial. In answer to further questioning, Dr. Scott testified that, in his opinion, plaintiff could sell newspapers at the time of the trial, and could run errands if the distance was not too great. He further testified that he made no reference in the proofs of disability, which he submitted to defendant, to any kidney condition, saying that that conditions was not very marked at that time. He further testified that there was nothing wrong with plaintiff's brain or spine, or with his left arm, and that there was nothing wrong with plaintiff's legs.

Dr. A. B. McQuillan, a physician and surgeon, testified, on behalf of defendant, that he examined plaintiff in January, 1936, and from his examination concluded that plaintiff's right wrist had suffered a loss of the lunate bone; and that there was a partial ankylosis due to tenseness of the ligaments. He gave it as his opinion that there was about twenty-five per cent. disability of the right wrist, which he thought would materially improve with use; that the history which he took from plaintiff at the time did not show that plaintiff had any urinary disturbance; and that plaintiff "eats and sleeps well." The witness testified that he found no other symptomatic disturbance.

Dr. Wendell Stewart, a radiologist, testified, as a witness for defendant, that he took X-ray photographs of the right hand of plaintiff on December 14, 1935, and on January 10, 1936, before and after the operation for the removal of the lunate bone from plaintiff's right

hand; that the X-ray showed a successful operation for the removal of the lunate bone; that there was no jaggedness of the articular surface of the radius and no fragments of bone left; that the second X-ray plate showed small areas of calcification in the place from which the bone had been removed.

Dr. Charles G. Hyndman, a physician and surgeon, testified that he was appointed by the Judge of the Assignment Division of the Circuit Court to make an examination of plaintiff, which he did on December 26, 1936; that he found plaintiff's blood pressure was normal, no abnormality in the heart and lungs; that his physical examination showed practically negative except for plaintiff's right wrist; that that plaintiff had a good grip, good movement of the fingers and wrist joint except in extreme flexion or extension of the wrist; found small scar on back of wrist, indicating previous surgical operation; that plaintiff complained of backache and kidney trouble, but, upon examination, there was nothing to be found; that examination of the urine showed no sugar, albumen, blood, or pus, or anything to indicate any kidney trouble at that time. The witness further testified that X-ray plates, taken by Dr. Ernst in connection with his examination, disclosed no evidence of any fracture or disturbance of the vertebrae, nor any disease of the soft parts of the back, kidney region, or abdomen; that the sacroilias joints seemed to be in normal outline, and showed no evidence of injury; that the only thing shown was that there had been a small bone removed from plaintiff's wrist called the semilunar bone; and that there was some roughening at the end of that bone.

Dr. Edwin C. Ernst, a radiologist, testified, on behalf of defendant, that, upon the recommendation of Dr. Hyndman, he made X-ray plates of plaintiff's wrist and of plaintiff's sacroiliac joint. Testifying from the X-ray plates of plaintiff's wrist, the witness said 'that the wrist joint was normal with the exception of the loss of the semilunar bone and a mild thickening in the joint, with about fifteen to twenty-five per cent. limitation of motion. With respect to the X-rays of the back and sacroiliac joint, the witness testified that the plate did not show any evidence of any injury, dislocation, bone pathology, or fractures of the lumbar bodies, lumbarsacral joint, or the sacroiliac joint.

H. T. Ragsdale, employment manager of Swift & Company at its plant in East St. Louis, Illinois, testified that plaintiff was discharged from his employment in the spring of 1936 for "insubordination."

It is not disputed that the group policy was applied for and delivered in the State of Illinois; and that the individual certificate was delivered to plaintiff in the State of Illinois where he resided. The policy, therefore, is to be construed in accordance with the law of that State, the law of Illinois having been pleaded by defendant. [Lukens v. Internatl. Life Ins. Co., 269 Mo. 574, 191 S. W. 418;

Crohn v. United Commercial Travelers, 170 Mo. App. 273, 156 S. W. 472.] Plaintiff, however, contends that Illinois law is not properly before the court, for the reason that, while defendant pleaded Illinois law, plaintiff denied it and defendant did not offer it in evidence, and that such denial made it incumbent upon defendant to prove that law; and that its failure to do so constituted an abandonment of its pleading of such law.

In the view which we take of this case, it is unnecessary to discuss or decide that particular question, for the reason that, under the law of Illinois as well as under the law of Missouri, as determined and stated by the highest court of each of said states, the evidence adduced by plaintiff was sufficient to warrant the court in submitting the case to the jury for the jury's decision. Defendant cites a number of cases from the Appellate Courts of the State of Illinois. It also cites one case from the Supreme Court of Illinois. The law of Illinois having been pleaded by defendant, this court will take judicial notice of the fact that the Supreme Court of Illinois is the highest court of that State, and the Appellate Courts thereof are subordinate to said Supreme Court, Section 806, R. S. Mo. 1929 (Mo. Stat. Ann., Section 806, p. 1057). We, therefore, deem it unnecessary to discuss the opinions and decisions of the Appellate Courts of Illinois, and proceed to an examination of the case of Grand Lodge Locomotive Firemen v. Orrel, 206 Ill. 208, 69 N. E. 68, which is the only Illinois Supreme Court decision and opinion cited by defendant herein.

In that case the beneficiary certificate sued on provided for the payment to the appellee of the sum of $1500, in the event of his total disability. The right of the appellee to recover from the Grand Lodge depended upon the meaning to be given to the phrase "totally and permanently incapacitated from performing manual labor" as provided in the by-law of the appellant Grand Lodge. In affirming the judgment of the lower courts against the appellant Grand Lodge, the Supreme Court of Illinois said:

"A condition of absolute and complete incapacity to do any manual labor ought not to be regarded as the true construction of the language of the by-law. Total inability to perform manual labor to an extent necessary to entitle him to receive earnings is what is meant. *One who has power to use his hand or hands at labor for a brief effort, only, and who is lacking in power to sustain the effort for a sufficient length of time to make the result thereof of any benefit to him in the way of assisting in his support, is for all practical purposes and in every actual sense totally incapacitated from performing manual labor.*" (Italics ours.) [Grand Lodge Locomotive Firemen v. Orrel, *supra*.]

Assuming, therefore, for the purposes of this case, that the law of Illinois is to govern in the construction of the policy involved herein,

as contended by defendant, we think it is clear, under the authority of Grand Lodge Locomotive Firemen v. Orrel, *supra,* that the trial court did not err in refusing to give defendant's peremptory instruction in the nature of a demurrer to the evidence. In considering the action of the court on the demurrer to the evidence, which is a procedural matter, we must, of course, apply the law of this State, for it has been held that the law of the forum controls as to the burden of proof, competency of witnesses, the weight of the evidence, and all matters relating to procedure. [Menard v. Goltra, 328 Mo. 368, 40 S. W. (2d) 1053.] The long-established and well-known rule in this State, in determining whether or not a trial court erred in refusing to give a peremptory instruction in the nature of a demurrer to the evidence offered by a defendant, requires us to take plaintiff's evidence as true, provided it is not at variance with common reason, and disregard defendant's evidence where it is in conflict with plaintiff's evidence; and further, we must give plaintiff the benefit of all reasonable favorable inferences arising from all the evidence.

Applying the foregoing rule, it appears that plaintiff became totally disabled while he was working for Swift & Company and while the policy involved herein was in full force and effect. As to whether or not he was "totally disabled and presumably will thereafter during life be unable to engage in any occupation or employment for wage or profit", as provided in the policy herein, the evidence which we must take to be true shows that plaintiff was suffering from high blood pressure and kidney trouble; that he also was suffering from an eighty-five per cent. disability of his right wrist, which is permanent; that he has pains in his shoulder and back; that, because of his kidney trouble, he is required to get up at night three or four times to urinate; that he is unable to stand forty or forty-five minutes at a time; that he cannot walk more than five or six blocks without sitting down; that he is unable to run; that he feels weak all the time; that there is a sprain in his sacroiliac joint, which is permanent; and that walking is against him. If plaintiff is suffering from the foregoing conditions, and for the purpose of passing upon the question under consideration, we must assume that he is so suffering, we think it is a reasonable inference that plaintiff was shown to be "lacking in power to sustain the effort for a sufficient length of time to make the result thereof of any benefit to him in the way of assisting in his support," as held in Grand Lodge Locomotive Firemen v. Orrel, 206 Ill. 208, 69 N. E. 68; and "presumably will, during life, be unable to engage in any occupation or employment for wage or profit" within the meaning of the policy involved herein.

The fact that plaintiff might be able to sell newspapers, or might painfully go on errands for distances of five or six blocks, is not sufficient, in our opinion, to show that plaintiff was able to engage in

an occupation or employment for wage or profit in the usual and customary way in which persons engaged in such occupations perform the duties thereof so as to warrant the court in holding, as a matter of law, that plaintiff was not entitled to recover. The evidence shows that plaintiff was possessed only of a third grade grammar school education; and that he had no experience whatsoever in business of any kind. Occupations open to him, therefore, must necessarily be those involving manual labor, and we believe it could not reasonably be said, as a matter of law, that a man with plaintiff's limited attainments, in such a physical condition as plaintiff's evidence shows him to be in, does not come within the meaning of the disability clause of the policy involved herein.

As to the law of Missouri, it is well settled in this State that it is sufficient to make it a question to be submitted to the trier of facts if it be shown that the insured is suffering from an infirmity or disease which renders him unable to perform, in the usual and customary way, substantially all the material acts of any occupation, business, or profession that he would be able to engage in except for his disabling infirmity or disease. [State ex rel. Metropolitan Life Ins. Co. v. Allen, 337 Mo. 525, 65 S. W. (2d) 469; State ex rel. Metropolitan Life Ins. Co. v. Hostetter, 338 Mo. 589, 92 S. W. (2d) 122; Rickey v. New York Life Ins. Co., 229 Mo. App. 1226, 71 S. W. (2d) 88; Moss v. Metropolitan Life Ins. Co., 230 Mo. App. 70, 84 S. W. (2d) 395; Pogue v. Metropolitan Life Ins. Co. (Mo. App.), 107 S. W. (2d) 144.]

We, therefore, hold that the trial court did not commit error in refusing to give defendant's peremptory instruction in the nature of a demurrer to the evidence.

Defendant complains of Instruction No. 2 given on behalf of plaintiff. That instruction, in the final form in which it was given, told the jury that, in determining the question as to whether plaintiff was, on February 21, 1936, and has been continuously from that date, totally disabled and presumably thereafter during life will be unable to engage in any occupation or employment for wage or profit, it was not necessary for them to find that plaintiff was and is now absolutely and completely incapacitated to engage in any work for wage or profit; but that it is sufficient to find that plaintiff's ailments and diseases, if any, are such that he is unable to engage in any work for wage or profit to an extent necessary to entitle him to receive regular earnings; and that, if the jury found and believed from the evidence that plaintiff was, on February 21, 1936, and has been continuously since said date, prevented, solely because of his ailments and diseases, if any, from engaging in any work for wage or profit to an extent necessary to entitle him to receive regular earnings, and presumably will thereafter during life be unable to engage in any work for wage or profit to an extent neces-

sary to entitle him to receive regular earnings; then the jury should find him totally and permanently disabled within the meaning of the terms of the policy.

The point of complaint against this instruction is upon the use of the words therein, "to an extent necessary to entitle him to receive regular earnings." We are of the opinion that the instruction is not open to the objections raised by defendant. It is in accordance with the law as declared by the Supreme Court of Illinois in Grand Lodge, etc. v. Orrel, *supra,* wherein that court held that "a condition of absolute and complete incapacity to do any manual labor ought not to be regarded as the true construction" of a by-law similar to the disability clause of the policy involved herein. It will be recalled that that court, in the case mentioned, further declared that:

"One who has power to use his hand or hands at labor for a brief effort only, and who is lacking in power to sustain the effort for a sufficient length of time to make the result thereof of any benefit to him in the way of assisting in his support, is for all practical purposes and in every actual sense totally incapacitated from performing manual labor."

We believe that the phrase complained of in the instruction given means practically the same as the phrase "to substantially assist in earning a livelihood", as used by the Illinois Supreme Court in Grand Lodge, etc. v. Orrel, *supra,* and cannot be said to have prejudiced any of defendant's rights or misled the jury, particularly in view of the clear, strong, and explicit instructions numbered three, four, five and six given by the court at the request of defendant. In said instructions every aspect of defendant's theory of the case was presented to the jury. When instruction number two, complained of, and defendant's instructions three, four, five, and six are all read together, as they should be, it will be found that the jury were fully and properly instructed upon the law of the case; and that they were required to find all the necessary facts and elements prerequisite to a proper verdict for plaintiff. The same conclusion necessarily follows if the instruction be tested by the decisions of the courts of this State, which we have heretofore cited herein in passing upon the court's ruling upon defendant's demurrer to the evidence.

Defendant next complains of instruction number one. That instruction is very lengthy and it would serve no useful purpose to present it in full here. It is sufficient to say that we have read it with care and find that it is within the evidence and within the pleadings. It hypothesizes all the material facts in evidence and requires the jury to find each and every fact necessary to be found as a prerequisite to a verdict for plaintiff. Defendant complains, however, that the instruction was erroneous because it required the

1220

jury to find for plaintiff if they found, among other things, that "plaintiff became totally and permanently disabled during the time plaintiff was a member of Swift & Company Employes Benefit Association and during the continuance of said insurance on the plaintiff", without instructing them as to the provisions of the policy which determined the date of the discontinuance of the insurance. Defendant points out that the provision of the policy covering this point provides that the insurance of any member insured under the policy shall automatically be terminated upon withdrawal from or termination of membership in Swift & Company Employes Benefit Association, or upon failure of the member to make the required premium contribution. We are of the opinion that this contention is not well founded when the whole instruction is taken into consideration. There could be no cancellation of the policy, as shown by its terms, until the end of the policy month in which plaintiff was discharged from his employment—that would mean the end of February, 1936. Plaintiff's evidence was to the effect that he was totally and permanently disabled prior to his discharge on February 21, 1936; and that the conditions he was suffering from at the time of the trial had troubled him before he was discharged from his employment. Furthermore, it is not disputed that his condition was such before his discharge that he was given light work, which his evidence tends to show he was not able to carry on successfully. Therefore, under the terms of the policy, if plaintiff's evidence was believed, liability for the benefits under the policy had attached before his discharge; and since the cancellation of the policy under its terms was not effective until the end of the month of February, 1936, it is clear that the policy was in force and effect up until that time. Therefore, plaintiff's disability existed while the policy was in force and effect, and the jury were required to so find. Furthermore, there is nothing in the instruction which required or permitted the jury to find anything to the contrary.

We find no reversible error in the record, and the judgment is accordingly affirmed. *Hostetter, P. J.,* and *Becker, J.,* concur.