Wallace E. FARMER, Jr., and Alice J. Farmer, Respondents,

v.

The LONDON & LANCASHIRE INSURANCE COMPANY, Ltd., a corporation, The Home Insurance Company, N. Y., and United States Fire Insurance Company, Appellants.

No. 22125.

Kansas City Court of Appeals.

Missouri.

Jan. 10, 1955.

Vance Julian, Clinton, Julian & Conrad, Clinton, of counsel, for appellants.

T. Bryant Johnson, Osceola, for respondents.

DEW, Judge.

Respondents brought this suit to recover under three fire insurance policies issued, respectively, by the appellants. A jury being waived, the court gave judgment for the respondents as follows: Against the London & Lancashire Insurance Company, Ltd., a corporation, $300; against the United States Fire Insurance Company, $200; against the Home Insurance Company of N. Y., $100. From this judgment the defendants appealed. For convenience respondents and appellants will be referred to hereinafter, respectively, as plaintiffs and defendants, as they appeared in the trial court.

The petition pleads three fire insurance policies issued to the plaintiffs, husband and wife, by the defendants, respectively, on a dwelling, jointly owned by the plaintiffs at

502 South Third Street in Clinton, Missouri. It is alleged that the policies, issued on different dates, were for different amounts, aggregating $6,000; that they were all in force on December 29, 1952, when the alleged fire occurred. It is averred that on December 29, 1952, a private outbuilding on the plaintiffs' premises, immediately behind the plaintiffs' dwelling, was damaged by fire to the extent of more than $600. The petition states that each policy contained the following clause:

"'The Insured may apply up to ten per cent (10%) of the amount specified for the dwelling, to cover private structures appertaining to the dwelling described and located on the premises, but not structures used in whole or in part for (a) mercantile, manufacturing, or farming purposes, nor (b) any structures (except structures used principally for private garage purposes) which are rented or leased to other than a tenant of the dwelling covered hereunder.'"

It is further alleged in the petition that the fire loss did not take place from any of the causes excepted in said policies; that the defendants had denied their liability for their respective proportions of the loss, on the ground that the building damaged was not a private outbuilding within the terms of the policies; that the defendants, under their respective policies, owe the plaintiffs on account of the alleged fire loss as follows: The London & Lancashire Insurance Company, Ltd., $300; United States Fire Insurance Company, $200, and The Home Insurance Company, N. Y., $100.

The answer of the defendants, in addition to a general denial, admitted the policies; admitted that they were in force and effect at the time of the alleged fire; admitted that the fire occurred, and that the building damaged thereby was an outbuilding belonging to the plaintiffs on their premises at 502 South Third Street in Clinton, Missouri; that the policies were issued on plaintiffs' dwelling at that address, but alleged that such outbuilding was at the time of such fire being used in part for "(a) mercantile, manufacturing or farming purposes", which was an exception contained in the policies.

The answer further alleged that plaintiffs had collected $1,435.52 for loss of contents in the outbuilding under a separate policy therefor issued by another insurance company under a mercantile form of policy, for a higher rate, and that the loss was paid under a proof of loss of goods, wares and merchandise used in plaintiffs' business or occupation.

The evidence discloses that prior to 1948, the plaintiff Wallace E. Farmer, Jr., was engaged in the business of making syrups and noncarbonated distilled drinks. He made those products in the basement of his home at 502 South Third Street, Clinton, Missouri. He had a place of business on East Franklin Street in Clinton, where he sold appliances, syrups and cigarettes. In 1948, he accepted employment with the Julep Company, as a manufacturer's representative for concentrates, in which employment he was still engaged at the time of trial. At that time or shortly prior thereto, he liquidated his business, closed his shop, sold most of his business property and stored the remaining bottling equipment and supplies in the basement of his home and in a two-story frame barn in the rear of the above residence property. The barn had been used to store a few household effects and seldom used as a garage for Mr. Farmer's car, although there was no garage on the premises. Such of the equipment and supplies from his place of business on East Franklin Street which he did not store in the barn when he closed his shop, he stored in the basement of his home. At no time had he ever mixed or made any of his beverages in the barn. He had a separate insurance policy on his equipment and supplies on East Franklin Street and had that policy transferred to cover the same in the barn on his premises, and the amount of that policy increased to $1,500. When the barn was partially destroyed by the fire in question, he collected $1,435.52 on that separate policy for loss of the contents.

Following the fire, which did not damage their dwelling, the plaintiffs made claim under the three policies issued by the defendants, claiming coverage of the loss on the barn under the ten percent clause above quoted, and on the contention that the barn was a private structure appurtenant to the dwelling on the premises and "not used in whole or in part for mercantile, manufacturing or farming purposes". Plaintiffs asserted that the loss to the barn exceeded $600, or more than ten percent of the total of $6000, face amount of the three policies, and contended that they were entitled to collect such ten percent from the defendants in the respective amounts pleaded.

The defendants introduced insurance rating cards from their files to show that the separate policy written by another insurance company on the contents of the barn was based on a rate applicable only to the use of such structure for mercantile purposes; that plaintiffs had paid premiums on such policy for five years and had increased the total amount of that policy after 1948; that on the other hand, the form of policies used on the dwelling here sued upon could not be used to cover an outbuilding such as the barn, which had been "rated" as late as June 2, 1952, for special exposures. In fact, the defendants took the position that, under the circumstances, the plaintiffs had no insurance at all which covered the barn structure.

The adjuster engaged by the defendants to adjust the loss testified as to the different forms of fire insurance policies and the different rates and rate cards applicable to ordinary forms and to special policies to cover special exposures, such as the contents of plaintiffs' barn. He testified that it was he that disclaimed defendants' liability on their policies for the loss to the barn and so recommended to the defendants. He said his reason was that the barn was not used for the sole purposes of a building or an outbuilding, or private garage, but that it "in my estimation was being used for the man's business". He said he based his opinion on the fact that plaintiffs had given a statement of the contents of the barn after the fire in collecting for the contents under the separate policy, and that such contents were mostly "goods that might be used in a mercantile establishment". He was asked: "Q. I say, do you have any knowledge of your own as to the use of any of the items on the inventory? A. I know that they are designed to be used in the bottling business. Q. Well, were they or were they not? A. That's something I couldn't tell you." There was no evidence produced that at the time of the fire, the items stored in the barn were being used by the plaintiffs in any business of any character.

The court elicited the following testimony from the defendants' adjuster:

"The Court: * * * Did you know, at the time you inspected the damage with a view to adjusting the loss, that Mr. Farmer hadn't been actively engaged in the bottling business or anything in connection therewith since 1948? A. I can't recall, Judge, but it seems like at the time there was something brought up, the fact that Mr. Farmer, if I recall right, was still, at the time of the loss, was still engaged in some kind of business to do with the bottling works. I mean, I can't recall just offhand.

"The Court: Well, he was a travelling man for some Julep Company out in Indiana or some place, perhaps, but he wasn't selling anything out of stock, according to his testimony, that is, he didn't deliver any merchandise any more to anybody. Now, were you aware of the fact that he had discontinued delivery of merchandise in 1948? A. No. * * *

"A. No, I—at that time I understood it was just storage.

"The Court: * * * When an individual, such as Mr. Farmer here, took out this policy on the dwelling house—and, of course, it covers outbuildings, too, normally, you know that. A. Yes.

"The Court: And everyone else knows it, I guess. He doesn't have access to any of these rating cards or anything of that sort, does he? A. Oh, yes he does.

"The Court: Well, I mean, the agent doesn't go to the trouble to show him all of these cards and things, does he, or does he just write the policy for him, deliver it, and he pays him, and they go on about their business? A. That's the usual procedure.

"The Court: Yes. And he would have no notice, then, from anyone that the policy might have been written at an incorrect rate or anything of that sort? A. The Audit Bureau, they check every one of these policies that are written, and any errors or corrections to be made, why, they will forward an endorsement notice back to the agent.

"The Court: And unless the agent had been told by the insured that he had a few items of stock left over since he quit business, that were stored in there, the agent wouldn't know anything about it either, would he? A. He would have no notice at all".

■ Defendants' first point relied on is that the "courts cannot and will not by judicial interpretation make a different contract than that made by the parties themselves". Such statement of an abstract principle of law, without specification of error, presents nothing for our review on appeal. 42 V.A.M.S. Supreme Court Rule 1.08; Bonnot v. Tackitt, Mo. App., 265 S.W.2d 748, 750.

■ Defendants' second point is that the court erred in refusing their motion for a directed verdict at the close of plaintiffs' case and at the close of the entire case because plaintiffs failed to make a submissible case. As has been frequently held by this and other appellate courts, the defendants waived any error in the denial of their motion for a directed verdict at the close of plaintiffs' case by proceeding thereafter to introduce evidence on the merits of the case. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S.W.2d 601; Porter v. Equitable Life Assurance Society of the U. S., Mo.App., 71 S.W.2d 766.

■ As to the defendants' motion to dismiss at the close of all the evidence on the ground that plaintiffs had failed to make a submissible case, we cannot say, as a matter of law, that under the evidence, the use of the barn at the time in question was shown to have been in part for mercantile purposes. Certainly the mere storage of business equipment in a barn does not make the barn a mercantile establishment in whole or in part. This is true even though the stored articles had at one time been elsewhere used for business purposes. We find nothing in the evidence that would constitute, as a matter of law, an exception to defendants' liability for loss of the barn under the ten per cent clause of their policies respecting outbuildings. We believe the Court correctly denied the defendants' motion for a directed verdict at the close of all the evidence.

■ The third and last point assigned is that the verdict is against the law and the evidence because the presence of the goods, wares and merchandise was not temporary. The evidence was not contradicted that the equipment and supplies in the barn were placed there in 1947 or 1948, at which time Mr. Farmer accepted other employment and discontinued their use in his shop on East Franklin Street, which he closed, and the property had not been used in any business since that date. There was substantial evidence to support the Court's obvious conclusion that the presence of the property in the barn was for the sole purpose of storage and not for the purpose of use in business there, whether the storage was temporary or permanent. Judgment affirmed.

All concur.