J. R. PRENTICE, d/b/a American Breeders Service and Don L. Hoyt, d/b/a Ozark Proved Sire Service, Plaintiffs-Respondents,

v.

W. E. ROWE, Defendant-Appellant.

No. 7734.

Springfield Court of Appeals.

Missouri.

May 2, 1959.

Motions for Rehearing or to Transfer Overruled June 2, 1959.

J. A. Appelquist, Mount Vernon, Bert Hurn, Neosho, Jack L. Hobson, of Mount Vernon, for defendant-appellant.

Douglas & Douglas, Neosho, Hardy Croxton, Rogers, Ark., for plaintiffs-respondents.

STONE, Presiding Judge.

Defendant, W. E. Rowe, appeals from a decree enjoining him "from artificially inseminating cattle, either directly or indirectly, in McDonald County, Missouri for a period of two years from November 21, 1957." About May 1948, Rowe (who theretofore had been a dairy farmer in McDonald County for fifteen years) began to work as an artificial inseminator of cattle—a calling frequently identified by the less discriminating and descriptive, but more dignified and distinguished, title of "technician." For a time, Rowe "worked on a commission" for Harry Rollins, a "pioneer of the artificial insemination business in Southwest Missouri," who did business as the Dairy Breeding Association of Carthage, Missouri. When Rollins sold his bulls in November 1951, to J. R. Prentice of Chicago, who does business as American Breeders Service (hereinafter referred to as ABS), Rowe entered the employ of ABS under a written "Technician's Employment Contract" which clearly and plainly established an employer-employee relationship between ABS and Rowe and spelled out the rights and obligations of the respective parties. Rowe's employment was to "inseminate all cows presented for service" in the stipulated "service area" of McDonald County, Missouri, "with semen furnished and at fees established by the employer."

Rowe continued in the employ of ABS until May 1, 1957, under similar written contracts. Each such contract provided that: "The Technician (Rowe) shall spend his full time on the Employer's (ABS) business. Such time as he has free after inseminating cows and performing other duties required hereunder, he shall spend in promoting the Employer's business and soliciting new business." And, each such contract contained a restrictive covenant in substantially the following language quoted from paragraph 9 of the last "Technician's Employment Contract" dated January 11, 1955 (hereinafter referred to as the employment contract): "While employed under this contract, and any extension or renewal thereof, and as long as the Employer carries on the business of artificial insemination of cattle during the two years after the termination of such employment, the Technician shall not * * *, in the service area (McDonald County, Missouri), artificially inseminate or take or solicit orders for the artificial insemination of cattle, with semen other than such as shall be furnished to the Technician by or through or with the permission of the Employer."

In May 1957, ABS sold to Don L. Hoyt of Springdale, Arkansas, "all right, title and interest of ABS in and to ABS's retail artificial inseminating business" in seven Missouri counties, including McDonald County, and Hoyt became the "distributor" for ABS semen in those counties. Under date of May 1, 1957, Hoyt (d/b/a Ozark Proved Sire Service) as "distributor" and Rowe as "purchaser" entered into a written "Contract for the Sale of Fresh Semen" (hereinafter referred to as the fresh semen sales contract). In this contract, the parties agreed, among other things, "that the purchaser (Rowe) is an independent contractor and the distributor (Hoyt) shall not direct, guide and supervise the manner in which the purchaser does his work" and "that the purchaser has no vested property right under this contract, but only a franchise to sell American Breeders Service semen in the above described territory (McDonald County, Missouri) for so long as this contract is in effect." The fresh semen sales contract contained *two* restrictive covenants. The *first* was that "the purchaser (Rowe) during the term of this contract, and for a period of two years after the termination of such agreement shall not (either on his own account or of a partner, representative, or otherwise) inseminate cows with semen, either fresh or frozen, other than that furnished by distributor (Hoyt)," and that "after the termination

of this agreement, purchaser shall not have the right to inseminate any cows serviced under this contract." The *second* was contained in another paragraph which embodied in the fresh semen sales contract by reference the restrictive covenant hereinbefore quoted from paragraph 9 of the employment contract of January 11, 1955. The fresh semen sales contract was "approved" in writing by ABS, although ABS was not a party thereto.

On October 8, 1957, Rowe signed a written "Resignation" in which he tendered "my resignation of employment, either as servant or independent contractor, to the American Breeders Service and the Ozark Proved Sire Service Co.," effective "30 days from date." The testimony concerning execution of this "Resignation" was in sharp and irreconcilable conflict. Hoyt and Divine (a field representative of ABS) testified that Rowe was "very bitter" toward ABS and "wanted to resign," and that he had signed the "Resignation" notwithstanding the fact that they had "begged Mr. Rowe * * * an hour or so not to resign." On the other hand, Rowe said that he did not read the "Resignation," and that he signed it because Hoyt and Divine requested and, in fact, "forced" him to do so, although (at another point in his testimony) Rowe conceded that Hoyt and Divine had "encouraged" him to continue "under the terms of the contract." In any event, the "Resignation" appears to have been an outgrowth of what Rowe referred to as "some difficulty" and "some disagreements," wholly unexplained in the record except for the suggestion inherent in Rowe's statement that his objection to continuing the sale of ABS semen was that ABS wanted to raise the breeding fee from $6 to $7.

On October 16, 1957, Ozark Proved Sire Service Company of Springdale (an Arkansas corporation controlled by Hoyt) as distributor and Rowe as purchaser executed another "Contract for the Purchase and Sale of American Breeders Service Proved Sire Semen" which was to have become effective "at day of delivery of frozen semen." This contract (hereinafter referred to as the frozen semen sales contract) provided, as had the fresh semen sales contract of May 1, 1957, that "the purchaser is an independent contractor" and that he had "only a franchise to sell American Breeders Service semen" in McDonald County. Notwithstanding the fact that the frozen semen sales contract by its plain terms never became effective because no frozen semen was delivered to Rowe (although all interested parties apparently contemplated as early as May 1957, that a change from fresh to frozen semen would be made when the latter became available), Hoyt, as President of Ozark Proved Sire Service Company, gave to Rowe on October 21, 1957, formal written "Notice of Termination of Contract" in which it was stated that "pursuant to *franchise contract dated Oct. 16, 1957* * * * 30 days notice is hereby given * * * that aforesaid contract shall be cancelled and set aside, and that any employment status, contractural (sic) or otherwise, shall be cancelled and held for naught as between the parties hereto." (All emphasis herein is ours.) And, notwithstanding the foregoing notice of October 21, 1957, and the fact that the *frozen* semen sales contract was the *only* contract bearing the date of October 16, 1957, Hoyt wrote Rowe on November 18, 1957, that "the termination of a certain contract for sale of *fresh* semen dated October 16, 1957, does not in any way effect (sic) our contractural (sic) relationship of another contract for sale of *frozen* semen dated October 16, 1957." And, notwithstanding Rowe's "Resignation" which was "accepted" by Hoyt on October 8, 1957 (when the *fresh* semen sales contract of May 1, 1957, was the *only* contract between Hoyt and Rowe), Rowe continued to purchase fresh ABS semen from Hoyt until November 20, 1957, and Hoyt continued to ship to Rowe for five or six days after that date until it became apparent that Rowe was not using the ABS semen sent to him.

Proceeding on the premise that he "got fired" by ABS or Hoyt and "had to make

a living," Rowe entered into a "Dealer's Contract" with Eastern Iowa Breeders on November 21, 1957; and, in the brief span of eighteen days before a temporary injunction was granted in this case on December 9, 1957, Rowe serviced with Eastern Iowa semen one hundred cows in McDonald County, many of whom previously had been serviced by him with ABS semen. The undisputed testimony in this case was that, within a few days after November 20, 1957, Hoyt's individual distributorship for ABS semen was terminated, and ABS "took over" McDonald County and employed as a technician therein one Gresham who was still working as an employee of ABS in McDonald County at the time of trial.

■ Plaintiffs, ABS and Hoyt, predicate their alleged right to injunctive relief upon defendant Rowe's violation of the restrictive covenants in the fresh semen sales contract of May 1, 1957. Although we have seined the seas of authority without netting any such curious concatenation of contracts, covenants, conflicts and confusion as that washed ashore in this case, certainly there is no dearth of legal literature dealing with restrictive covenants, as is emphasized and demonstrated in Arthur Murray Dance Studios of Cleveland v. Witter, Ohio Com.Pl., 105 N.E.2d 685—a studious and scholarly exposition sharply contrasting with the frequently shallow and superficial, sometimes slipshod and slovenly, treatment accorded important questions by counsel and courts alike. Stated in general terms, the law now is that a covenant restraining an employee, upon termination of employment, from competing with his former employer is valid and enforceable if it is reasonable as to the employer, the employee and the public, when viewed in the light of all of the facts and circumstances of the particular case under consideration. See the multitude of authorities collected and classified in the Arthur Murray case, supra, 105 N.E.2d loc. cit. 691–693. To be reasonable, the restraint usually must be qualified as to both time and area and must

be no greater than fairly required for protection of the person for whose benefit it is imposed. Renwood Food Products v. Schaefer, 240 Mo.App. 939, 951, 223 S.W.2d 144, 151.

■ By the fresh semen sales contract of May 1, 1957, Hoyt, a distributor, granted to Rowe, an independent contractor, "only a franchise to sell American Breeders Service semen" in McDonald County, but the *first* restrictive covenant in that contract, although limited as to time (i. e., two years after termination of the contract), purported to prohibit Rowe from any artificial insemination of cattle (except with ABS semen furnished by Hoyt) *without limitation as to area*. Compare Mallinckrodt Chemical Works v. Nemnich, 83 Mo. App. 6, 15–16, affirmed 169 Mo. 388, 69 S.W. 355. A restrictive covenant limiting an individual in the exercise or pursuit of his occupation is in restraint of trade [Corbin on Contracts, Vol. 6, § 1392, loc. cit. 509; Restatement of Contracts, Vol. 2, § 513, p. 987], and the burden of establishing its validity, by showing that it is reasonable, rests upon the party claiming its benefit. Arthur Murray case, supra, 105 N.E.2d loc. cit. 693(6) and authorities there collected; Grace v. Orkin Exterminating Co., Tex.Civ. App., 255 S.W.2d 279, 283(2); Kadis v. Britt, 224 N.C. 154, 29 S.E.2d 543, 545(2), 152 A.L.R. 405. With no evidence in the record before us as to the area within which ABS semen has been or is sold, and with an affirmative showing that, after termination of his individual distributorship during the latter part of November, 1957, Hoyt had no employee, dealer or "purchaser" in McDonald County, we cannot find that the restraint imposed by the *first* restrictive covenant, wholly unlimited as to area, was reasonable and no greater than fairly required for protection of ABS and Hoyt, who here seek its shelter. Compare Delmar Studios of the Carolinas v. Kinsey, 233 S.C. 313, 104 S.E.2d 338. Accordingly, we hold that the *first* restrictive covenant was invalid.

■ However, the *second* restrictive covenant (as embodied in the fresh semen sales contract of May 1, 1957, by reference to paragraph 9 of the employment contract of January 11, 1955) maintained in full force and effect the restriction that, while Rowe was employed by ABS and "as long as (ABS) carries on the business of artificial insemination of cattle during the two years after the termination of such employment," Rowe would not inseminate cattle (except with semen furnished by, through or with the permission of ABS) "in the service area" which was specifically described as, and limited to, McDonald County. Thus, the restraint imposed by the *second* restrictive covenant was qualified, and we think reasonably so, both as to time and as to area. Haysler v. Butterfield, 240 Mo.App. 733, 218 S.W.2d 129; Northeast Georgia Artificial Breeders Ass'n v. Brown, 209 Ga. 547, 74 S.E.2d 660; annotation 43 A.L.R.2d 94; annotation 41 A.L.R.2d 15. It is true that, as Rowe emphasizes, neither ABS nor Hoyt imparted any trade secrets to him or gave him any list of customers. However, an employer may be entitled also to invoke the protection afforded by a reasonable restrictive covenant against attempts by a former employee to solicit and entice away customers whom he had served for such employer. Renwood Food Products v. Schaefer, supra, 240 Mo. App. loc. cit. 952, 223 S.W.2d loc. cit. 151.

■ It does not lie in Rowe's mouth to say that injunctive relief should be denied to ABS, his former employer, on the theory that the owners of cattle inseminated by Rowe during the period of his employment by ABS were customers of Rowe, and not of ABS. When Harry Rollins, for whom Rowe had "worked on a commission," sold his bulls to ABS in November 1951, Rowe became a full-time employee of ABS, with whom he specifically covenanted in writing that "such time as he (Rowe) has free after inseminating cows and performing other duties required hereunder, he shall spend in promoting the Employer's business and soliciting new business"—the same obligation any loyal employee would have owed to a new employer [Haysler v. Butterfield, supra, 240 Mo.App. loc. cit. 739, 218 S.W.2d loc. cit. 131]; and, a map of McDonald County (received in evidence), showing the location of ABS' customers served in 1956 and of sixty-six new customers "who started" in 1957, indicates that Rowe in good faith recognized his obligation to promote, and in fact did promote, the sale and use of ABS semen in McDonald County. Certainly, ABS had a right to safeguard and protect, by a reasonable restrictive covenant, the business and good will developed in McDonald County as the fruit of Rowe's employment by ABS for the period of more than five and one-half years from November 1951 to May 1957. City Ice & Fuel Co. v. Snell, Mo. App., 57 S.W.2d 440; Willis v. Dictograph Sales Corp., 222 Ind. 523, 54 N.E.2d 774. See also Masden v. Travelers' Ins. Co., 8 Cir., 52 F.2d 75, 77, 79 A.L.R. 469; Chicago Life Ins. Co. v. Tiernan, 8 Cir., 263 F. 325, 332.

The record plainly shows that, in the period of eighteen days after November 20, 1957, Rowe serviced one hundred cows in McDonald County with semen purchased from Eastern Iowa Breeders, a competitor of ABS, many of those cows having been serviced by him previously with ABS semen; and, the evidence is just as clear that, although Rowe had serviced with ABS semen one hundred twenty cows in McDonald County during August 1957, one hundred seven cows during September 1957, and eighty-one cows during the period from November 1 to 20, 1957, sales of ABS semen in McDonald County immediately dropped to an insignificant level when Rowe ceased its use, Gresham (the full-time technician-employee for McDonald County hired by ABS shortly after November 20, 1957) having bred only seven cows during the entire month of December 1957. So, although there is no suggestion that the cows in McDonald County recognized any distinction between Rowe and Gresham or indicat-

ed any preference for either, the owners of the cows apparently did. "Human nature being what it is" [Haysler v. Butterfield, supra, 240 Mo.App. loc. cit. 739, 218 S.W.2d loc. cit. 131], ABS sought, by the restrictive covenant in paragraph 9 of the employment contract which was carried forward and maintained as the *second* restrictive covenant in the fresh semen sales contract, to guard against just such consequences as followed Rowe's termination of use of ABS semen; and, in the light of all of the facts and circumstances of the instant case, we are constrained to conclude that the restraint imposed by this restrictive covenant was reasonable as to Rowe and no greater than fairly required for protection of ABS [cf. Ontario, County Artificial Breeders Coop. v. Shappee, 205 Misc. 175, 127 N.Y.S. 2d 888; Northeast Georgia Artificial Breeders Ass'n v. Brown, supra], and that "(t)here is no practical man who would not smile at the conceit that the public welfare would sustain an injury by enforcing" it. Presbury v. Fisher & Bennett, 18 Mo. 50, 51; Gordon v. Mansfield, 84 Mo.App. 367, 377; Mitchell v. Branham, 104 Mo. App. 480, 486, 79 S.W. 739, 740.

■ But, since the restrictive covenant under consideration is one in restraint of trade and personal liberty, it should not be construed to extend beyond its fair import. State ex rel. Youngman v. Calhoun, Mo.App., 231 S.W. 647, 649; Athletic Tea Co. v. Cole, Mo.App., 16 S.W.2d 735, 736 (2). The restraint imposed upon Rowe by this covenant was for the period of his employment by ABS "and as long as the Employer (ABS) carries on the business of artificial insemination of cattle *during the two years after the termination of such employment*." There can be no doubt but that Rowe's employment by ABS terminated on May 1, 1957, when he became an independent contractor under the fresh semen sales contract between Hoyt and Rowe. Accordingly, the period of two years for and during which ABS is entitled to injunctive enforcement of this covenant expired on April 30, 1959.

■ We need not and do not determine whether, under other circumstances, Hoyt might have been entitled to enforce the *second* restrictive covenant in the fresh semen sales contract, for the record establishes beyond room for argument that Hoyt's individual distributorship for ABS semen was terminated within a few days after November 20, 1957, and that thereafter Hoyt had no employee, dealer or "purchaser" in McDonald County and acted only in a supervisory capacity for ABS. In short, there is no evidence that Hoyt had any business interest in McDonald County either when this action was instituted or when it was tried. The remedy of injunction, frequently characterized as "the strong arm of equity," is a summary, transcendent and extraordinary remedy, may not be invoked as a matter of course, and should be exercised sparingly and only in clear cases [Barnhart v. Ripka, Mo.App., 297 S.W.2d 787, 792(10), and cases there collected; 28 Am.Jur., Injunctions, § 24, p. 217]; and, with no showing of actual or threatened injury to Hoyt, he was entitled to no injunctive relief. 28 Am.Jur., Injunctions, § 108, loc. cit. 302; Corbin on Contracts, Vol. 6, § 1394, loc. cit. 520, 522. Consult also 43 C.J.S., Injunctions, § 22, p. 439; Ibid., § 23, p. 446; Ibid., § 84b(1), loc. cit. 567; 28 Am.Jur., Injunctions, § 47, p. 242; Ibid., § 83, p. 277. And, see again the Arthur Murray case, supra, 105 N.E.2d loc. cit. 701 et seq.

The decree of the trial court is set aside and the cause is remanded with directions to enter a decree (1) finding the issues in favor of ABS and against Rowe and enjoining him from artificially inseminating any cattle, or taking or soliciting orders therefor, in McDonald County, Missouri, prior to May 1, 1959, (2) dismissing the bill in equity with prejudice as to plaintiff Hoyt, and (3) taxing the costs in the trial court against plaintiff Hoyt and defendant Rowe, share and share alike, i. e., one-half of such costs to be paid by Hoyt and one-half to be paid by Rowe. Costs upon this

**464**

appeal are taxed against respondents ABS and Hoyt, share and share alike.

McDOWELL and RUARK, JJ., concur.

(On Motions for Rehearing or to Transfer)

STONE, Presiding Judge.

The burden of defendant Rowe's motions for rehearing or to transfer is that we did not pass on all of the questions raised by him. We add these comments that he may know that all of them were considered and that their determination, adversely to him, was inherent in our decision, although, in a vain effort to shorten our opinion, we sought to avoid prolix discussion of each sub-point.

One of Rowe's sub-points was that "the cancellation of the employment contract (of January 11, 1955), avoided and rescinded by the parties on May 1, 1957, by (fresh semen) sales contract discharged the defendant." The short but complete answer is that, as pointed out in our original opinion, plaintiffs predicated their alleged right to injunctive relief upon Rowe's violation of the restrictive covenants in the fresh semen sales contract of May 1, 1957, not upon violation of the "rescinded" employment contract of January 11, 1955.

■ The sub-point that "as a general rule a party cannot repudiate a contract so far as its terms are unfavorable to him and claim the benefit of the residue" is nothing more than an abstract statement of law which, without any showing how it is related to any action or ruling of the trial court, presents nothing for appellate review. Supreme Court Rule 1.08, subd. (a) (3) and (d), 42 V.A.M.S.; Turner v. Calvert, Mo., 315 S.W.2d 118, 120(2); Scowden v. Scowden, Mo.App., 298 S.W.2d 484, 485(1); Lewis v. Watkins, Mo.App., 297 S.W.2d 595, 597(3); Thrasher v. Allen Estate, Mo.App., 291 S.W.2d 630, 632; State ex rel. Rueseler Motor Co. v. Klaus,

Mo.App., 281 S.W.2d 543, 545(1); Farmer v. London & Lancashire Ins. Co., Mo.App., 274 S.W.2d 517, 520(1).

■ The next two sub-points in Rowe's brief deal with construction of the *second* restrictive covenant in the fresh semen sales contract, which, in the following language, embodied in that contract by reference the restrictive covenant in the employment contract of January 11, 1955: "* * * the agreements of the technician (Rowe) under the technician's (employment) contract contained in paragraph 9 of said contract, with reference to artificial insemination of cattle after termination of employment under said contract, only with semen furnished by, through or with the permission of ABS, shall nevertheless remain in effect, and shall be binding on Distributor (Hoyt)." Rowe's theory seems to be that, under the quoted language, this restrictive covenant was "binding on Distributor (Hoyt)" *only*. To support this contention, Rowe relies on the secondary rule [Williston on Contracts (Rev.Ed.), Vol. 3, § 621, p. 1788] or subsidiary aid [Engel v. Cord Moving and Storage Co., Mo.App., 313 S.W.2d 173, 176] of contractual construction that, if a written contract is ambiguous, it should be construed against the party who prepared it. Leathers v. Metalcraft Mfg. & Sales Corp., Mo.App., 240 S.W.2d 211, 213(3); John Deere Plow Co. v. Cooper, 230 Mo.App. 167, 91 S.W.2d 145, 148(2); Belch v. Schott, 171 Mo.App. 357, 157 S.W. 658, 660(2); 17 C.J.S., Contracts, § 324, p. 751; 12 Am.Jur., Contracts, § 252, p. 795. But, it is an essential prerequisite to application of this secondary rule or subsidiary aid that the contract under consideration be ambiguous [Corbin on Contracts, Vol. 3, § 559, loc. cit. 154], i. e., reasonably and fairly susceptible of different constructions [J. E. Blank v. Lennox Land Co., 351 Mo. 932, 174 S.W.2d 862, 868; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 267(3); State ex rel. National Life Ins. Co. v. Allen, 301 Mo. 631, 256 S.W. 737, 739(3); Webb-Kunze Const. Co. v. Gilsonite Const. Co., 281 Mo. 629, 220

S.W. 857, 860]; and, even then, resort is to be had to this subsidiary aid, long ago bluntly depreciated as "not very important" [Commercial Electrical Supply Co. v. Missouri Commission Co., 166 Mo.App. 332, 341, 148 S.W. 995, 997], only if and when all other means of contractual construction fail. Conservative Federal Savings & Loan Ass'n v. Warnecke, Mo.App., 324 S.W.2d 471; Katz Drug Co. v. Kansas City Power & Light Co., Mo.App., 303 S.W.2d 672, 680(6); Isaac T. Cook Co. v. Bank of St. Louis, Mo.App., 297 S.W.2d 607, 610(1); Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 820(5); 17 C.J.S., Contracts, § 324, loc. cit. 753–754; Corbin on Contracts, Vol. 3, § 559, loc. cit. 154.

The primary and cardinal rule, which permeates and pervades the entire field of contractual construction, is that the court should ascertain the intention of the parties and (unless that intention is in conflict with public policy or some positive rule of law) then give effect thereto. Tamko Asphalt Products, Inc. v. Fenix, Mo. App., 321 S.W.2d 527, 533(6); Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 495 (4); Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415, 420(9). So, greater regard is accorded to the clear intention of the parties than to any particular language used in attempting to express that intention. Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507; Ragsdale v. Tom-Boy, Inc., Mo.App., 317 S.W.2d 679, 685(3); Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W.2d 108, 111(2); Rickey v. New York Life Ins. Co., 229 Mo.App. 1226, 71 S.W.2d 88, 93; 17 C.J.S., Contracts, § 295a, loc. cit. 693. The fresh semen sales contract is not rendered ambiguous simply because the parties thereto now disagree as to its proper construction [Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731, 738(6); York Pharmacal Co. v. Henry C. Beckmann Realty & Inv. Co., Mo.App., 304 S.W.2d 40, 42(1); National Pigments & Chemical Co. v. C. K. Williams & Co.,

8 Cir., 94 F.2d 792, 795(1)]; and, construing that contract in its entirety and giving effect to every part thereof, as is our duty [Ott v. Pickard, 361 Mo. 823, 237 S.W. 2d 109, 111(3); McFarland v. Gillioz, 327 Mo. 690, 37 S.W.2d 911, 915(3); Belt Seed Co. v. Mitchelhill Seed Co., 236 Mo.App. 142, 153 S.W.2d 106, 110(8); 12 Am.Jur., Contracts, § 253, loc. cit. 798], we perceive no ambiguity [Myers v. Union Electric Light & Power Co., 334 Mo. 622, 629, 66 S.W.2d 565, 568(1)] and we encounter no difficulty in ascertaining the manifest intention of the parties that, although the employment contract of January 11, 1955, between ABS and Rowe was being superseded by the fresh semen sales contract of May 1, 1957, between "distributor" Hoyt and Rowe, the restrictive covenant in the employment contract "*shall nevertheless remain in effect*" and such covenant also "shall be binding on Distributor (Hoyt)" who was not a party to the employment contract. Thus, we find no occasion to resort to any secondary rule or subsidiary aid in construing the fresh semen sales contract [Engel v. Cord Moving and Storage Co., supra, 313 S.W.2d loc. cit. 176; Hamilton Fire Ins. Co. v. Cervantes, Mo.App., 278 S.W.2d 20, 24; Grossenbacher v. Daly, Mo. App., 287 S.W. 781], and we reject Rowe's argument (to us strained and specious) that the second restrictive covenant in that contract was binding on Hoyt only.

Point III in Rowe's brief was that "the (trial) court erred in failing to rule that the restrictive covenants in both contracts were unenforceable by reason of being unreasonable and oppressive," followed by an abstract statement that "economic hardship and undue oppression will render a restrictive covenant unenforceable." In asserting that we failed to rule this point, Rowe's counsel overlook our specific holdings that the *first* restrictive covenant in the fresh semen sales contract was *unreasonable* but that the *second* restrictive covenant in that contract was *reasonably* qualified and limited as to time and as to area, and our definite conclusion that "the re-

straint imposed by this (second) restrictive covenant was *reasonable* as to Rowe and no greater than fairly required for protection of ABS." We decline abstract speculation as to what might render a restrictive covenant so harsh and oppressive that it would become unreasonable and unenforceable as to an employee, but those with an academic interest in this field may be enlightened and edified by the discussions in the Arthur Murray case, supra, 105 N.E.2d loc. cit. 692, 699–700, and in Corbin on Contracts, Vol. 6, § 1394, pp. 514–525.

Rowe (a dairy farmer for fifteen years before he began to inseminate cattle) voluntarily entered the employ of ABS in 1951 and, for more than five and one-half years thereafter, continued in the same employment under written contracts, each of which contained the restrictive covenant carried forward and embodied in the fresh semen sales contract. No doubt, enforcement of that restrictive covenant has inconvenienced Rowe and has resulted in some temporary financial loss to him; but, the courts (if not Rowe) are concerned also with the importance of requiring those, who solemnly assume contractual obligations, to observe and fulfill them. Renwood Food Products v. Schaefer, supra, 240 Mo.App. loc. cit. 951, 223 S.W.2d loc. cit. 151; Montgomery v. Getty, Mo.App., 284 S.W.2d 313, 317. Under the restrictive covenant here enforced, Rowe remained at liberty to engage in any work or business whatsoever excepting only artificial insemination of cattle during a limited period within the narrow confines of a single county. Compare City Ice & Fuel Co. v. Snell, supra, 57 S.W.2d loc. cit. 442; City Ice & Fuel Co. v. McKee, Mo.App., 57 S.W.2d 443, 447. We repeat that, in our considered judgment, the restraint imposed by that restrictive covenant was not unreasonable as to Rowe.

The motions for rehearing or to transfer are overruled.

McDOWELL and RUARK, JJ., concur.