**RIVER CORPORATION, Respondent,**

v.

**William REDPATH, Appellant.**

**No. 25405.**

Kansas City Court of Appeals, Missouri.

April 5, 1971.

Max W. Foust and Russell D. Jacobson, Morris, Foust, Moudy & Beckett, Kansas City, for appellant.

James B. Lowe, Kuraner, Oberlander, Dingman, Brockus & Lowe, Kansas City, and Hendren & Andrae, Jefferson City, for respondent.

DIXON, Commissioner.

Appellant, defendant below, was permanently enjoined by the trial court. He appeals contending the trial court should not have issued its injunction because the plaintiff's conduct contributed to or caused the condition complained of, and second, that there is no showing in the evidence of irreparable injury. He thus raises questions relating to the sufficiency of the evidence to sustain the issuance of the injunction, and we review on that assumption.

The injunction was issued under Count I which was pursuant to Rule 82.06 designated as an appealable judgment. Proceedings on Counts II and III of the petition and Counts I and II of defendant's counterclaim are still pending in the court below. The trial court entered judgment on Count II, but it is not before us on this appeal.

The scope of review is indicated by Rule 83.13(c), V.A.M.R., which provides that we shall rule the case upon the law and evidence, weigh the evidence, and render such judgment as the trial court should have rendered. Rule 73.01(d), V.A.M.R., also provides guidance by indicating to us that we should not set aside the judgment unless clearly erroneous and also we may make our own findings of fact. We defer to the findings made by the trial court because of his superior opportunity to weigh the evidence presented.

The plaintiff company is the successor to a corporation which acquired by deed the mineral rights subsurface to the defendant's fee interest in the land in question. The mineral rights were acquired by the plaintiff long prior to the defendant's ownership. Defendant had actual knowledge of the right to mine the subsurface for limestone and knowledge of the manner in which mining was accomplished. Plaintiff mines limestone by the room and pillar method in the Bethany Falls ledge of limestone rock. Its mining operation at the location in question extends over approximately 600 acres, the surface land being owned by several owners, among them the defendant. Plaintiff's method of mining, generally recognized as the appropriate method in circumstances that exist in this area, is to carve into the limestone of the Bethany Falls stratum a room approximately 35 feet square and to leave a pillar of limestone approximately 25 feet square at each corner of each room. The height of the room is determined by the depth of the limestone and the "parting seam" which is mechanically the appropriate place to separate the limestone at the roof level and which varies from point to point. The mine is generally in the lower seventeen or eighteen feet of the twenty-two to twenty-five feet of limestone in the Bethany Falls. The carving out is done by the use of explosives, and the rubble thus created is taken by machinery to the mine outlet and is converted for substantial uses in the community for aggregate in concrete, the production of concrete itself, and agricultural purposes. Plaintiff's operation is a substantial one involving an investment of 2½ million dollars and may be said to have a substantial economic impact upon the community. The mining process removes the Bethany Falls ledge down to the "Ladore shale" which is a shale formed under the compression of the earth's surface and which when wetted and dried, "slakes", which ultimately will cause its deterioration and result in its being reduced to its original form of clay, either mud or dust as the presence of moisture dictates. The pillars, which support the remaining portion of the Bethany Falls limestone and thus the over burden of rock and earth, rest upon the Ladore shale and derive their support from its continued presence in its natural state. Some water is encountered in the normal mining process, and this water is disposed of by the creation of sumps or pits in the Ladore shale which collect the moisture for removal by tank wagon or other mechanical drainage.

The use of machinery emitting diesel fumes, the drilling for blasting, and the blasting itself cause dust and fumes which require ventilation of the mined area by the creation of air holes or air shafts. These shafts are so placed as to permit the free circulation of air within the mined area and are normally created by drilling into the roof of a room between the pillars and blasting the roof out of a room which permits the rock and dirt above the Bethany Falls ledge to come down into the room and thus open an area to the surface. What has been said with respect to the creation of these air shafts demonstrates

that under optimum conditions they will be created where the over burden is the thinnest, and under ideal circumstances, they will be so located as to take advantage of the natural contour and simply break out in an exposed region or other natural depression at a point where the Bethany Falls ledge is exposed or nearly so. The Bethany Falls ledge of limestone in the area where this mining takes place slopes gradually toward the Missouri River, or as in this location, northward, and in the circumstances of the mining operation here, the inclination of the mine floor is downward from the mine entrance to the north. The mine entrance and works here in question are on the south portion of plaintiff's mineral holdings.

In April of 1965 a collapse occurred under a portion of the defendant's land which the plaintiff characterizes as a fortuitous air shaft and which the defendant characterizes as a cave-in. The exact location of this opening in defendant's surface lands will be shown by reference to the photograph appended to this opinion [Exhibit 10]. A witness oriented this photograph as to compass direction as the marking on the photograph indicates. It demonstrates that the opening occurred on the southerly side of an existing ravine which runs generally east and west with the slope or drainage to the east and which drains some 20 acres of land. It likewise shows a very small pond immediately adjacent to the opening in the surface and an earthen dam creating this pond. This earthen dam and pond did not exist prior to the surface opening, but were built by the defendant in October or November of 1966.[1] This dam measures 20 feet in a north and south direction, 5 or 6 feet wide east to west and is 3 or 4 feet above the surface of the ravine. The top of the dam is above the lowest portion of the opening leading to plaintiff's mine. Prior to the creation of this dam, no water arising from the drainage of the 20 acres and normally flowing in the ravine entered plaintiff's mine. Aft-

er the creation of the dam and beginning in June of 1967, a large volume of water entered plaintiff's mine. This water was entering the plaintiff's mine through the hole in the surface and at a point where the south edge of the small pond is contiguous to the edge of the opening in the surface. The plaintiff immediately sandbagged the northerly edge of the opening in the earth to prevent the flow of water. Thereafter, and on some 15 or 20 occasions, the sandbags were ripped apart and removed so that water continued to flow into the mine. The defendant admitted to some of the destruction and removal of sandbags, but not all of it. Plaintiff likewise attempted to control the flow of water into the mine by pumping it into a 2-inch pipe out into the ravine; but the pipe was broken off and torn apart, and on one occasion, concrete was stuffed into the pipe. Over a period of a year's time and at various intervals, water entered the mine in a sufficient quantity to cover 5 or 6 acres of the mine floor to a depth ranging from a few inches to 30 inches. Photographs were introduced which show substantial quantities of water standing on the floor of the mine and which demonstratively interfere with the use of that portion of the mine for any purpose. The evidence also demonstrates that such water upon the surface of the mine will cause danger to the entire surface area above where such water is saturating the Ladore shale under the pillars supporting the surface. Although there was a disagreement as to the length of time which might be required for this to occur, all of the experts who testified agreed that it would eventually cause the collapse of the surface. There was evidence that, in addition to the danger of collapse enhanced by the presence of water, the floor of the mine was rendered muddy and slippery and prevented the use of machinery and that the disintegration of the Ladore shale would result in the contamination of the rock products mined to a sufficient extent to make their commercial use

---

1. The larger pond on the lower portion of the photo is not involved in the issues here.

unlikely. The natural incline of the mine in question coupled with the continued ingress of water would result in the flooding of the entire mine if permitted to continue. Plaintiff had attempted to dam the water to prevent its spread in the mine. This apparently had not been completely successful.

The earthen dam created by the defendant is sometimes in the evidence referred to as a passageway for vehicles to a 4-acre tract owned by the defendant and separated by the ravine from the rest of his property and in other instances is referred to as a protective device to protect another roadway located much further downstream in the ravine and which is shown by two parallel pen marks in the upper left-hand corner of the photograph reproduced here. Defendant admitted, as has been noted, the destruction and removal of the sandbags on at least one occasion and on one other, the time of which he could not specify. He further admitted that he interferred with the sandbag barrier because he was angry, first, because the plaintiff caused the collapse of his surface and, second, because they had trespassed upon his surface to install the fence and the sandbags.

Plaintiff's right to remove the rock is based upon a specific grant from the defendant's predecessor in title which defendant had examined and which provides for the right to remove the rock deposit and "to sink air shafts on said land suitable to second party in construction, number and location." The instrument provided that the rock should be extracted "by the tunneling and mining method now or hereafter customarily used by second party * * * in * * * regular operations, leaving reasonably sufficient rock roof and rock supports to sustain the present elevation of the surface ground in its present position under ordinary conditions."

Much of the testimony in this case relates to the right of plaintiff to utilize the "cave-in" as an air shaft and, correspond-

ingly, defendant's right to maintain the integrity of his surface. In the view we take of the issue presented on this appeal, none of the evidence concerning these matters is determinative. To demonstrate this, we here set out the permanent injunctive order actually issued by the trial court. It is as follows:

"(a) The defendant will refrain from all and any acts diverting or tending to divert surface water into the plaintiff's mine.

(b) The defendant will refrain from interfering with the plaintiff in the operation of its mine, and the defendant will refrain from interfering with the plaintiff in protecting its mine from water, by sandbagging the area around and proximate to said air shaft or by any other method in such area as may be reasonably necessary and likely to prevent water from flowing into plaintiff's mine.

(c) The plaintiff may have such ingress and egress over defendant's lands as is necessary to protect its mine to the extent set out in paragraph (b) hereof, and plaintiff may maintain not more than two watchmen at any time within 100 feet of said air hole."

It will be seen that the trial court by its order directed the defendant only as to his conduct with respect to the conditions as they existed after the collapse and dealt only with the rights of the defendant to the continued operation of the mine without interference by the diversion of surface water into the plaintiff's mine either by direct action of the defendant or by the removal of protective devices installed by the plaintiff, together with the necessary order to protect the plaintiff in the exercise of its right of ingress to protect its subsurface facilities.

As we have indicated, Count II of plaintiff's petition for declaratory judgment as to the right of support, although heard and ruled at the same time as the injunctive phase of this litigation, under Count I, is

not before us on this appeal. Likewise, still pending between the parties is litigation relating to the damages issues between the parties. We make this explanation to narrow the issues to those necessary for determination of the litigation now before us.

Counsel have industriously submitted authority on various propositions which we note but do not rule. These propositions include the question of the right of the owner of the minerals to create the air shaft or air hole in the manner indicated, the question of diversion of surface waters and questions concerning the defendant's right to support of the surface contrasted with the plaintiff's right to remove the minerals obtained by its mineral deed. These questions are not in this branch of this case although evidence was presented thereon and the trial court made findings with respect thereto under Count II of plaintiff's petition.

We likewise note that counsel have referred us to cases which establish principles of equity jurisprudence relating to injunctions. We can draw from these cases certain principles for the ruling of the general questions arising with respect to the issuance of injunctions.

These principles are: that the use of an injunction is a harsh remedy granted only in clear cases, that an injunction is a strong arm of equity and ought not to be issued except for the prevention of great and irreparable harm and will not lie where the right is doubtful,[2] that he who comes into equity must do so with clean hands.[3] The enunciation of these principles does little to solve the problem of these cases, for their generality requires application to the facts of each case. Counsel have not cited us to any case, nor has our own research disclosed a case which is comparable to the instant case on its facts.

Defendant cites two cases which at first glance would appear to support his position. These are Gatson v. Farber Fire Brick Co., 219 Mo.App. 558, 282 S.W. 179, and Southwest Missouri Railway Co. v. Big Three Mining Co., Mo.App., 119 S.W. 982. Both of these involve actions against mining companies which had caused a collapse of the surface. They may well have a bearing on the issues presented under Count II in which that issue is directly present. They are not directly controlling on this branch of the appeal because we are not here concerned with the collapse or the causes for the collapse, but we are concerned with actions subsequent to the collapse.

Defendant's first contention, plainly stated, is that plaintiff, having caused the collapse of the surface by mining at the place where it did, cannot complain of defendant's action in diverting the surface water so as to permit the same to flow into the collapsed area and thereby enter the mine of plaintiff. He asserts that plaintiff's failure to support the surface properly and to give notice of the collapse or to protect the opening after collapse or to halt the continuing erosion and enlargement invited or created or contributed to create the water in the mine. Such argument ignores the character of restraint decreed by the trial court which was prospective only and which directed the defendant simply to do what he would have had to do under any and all circumstances of a collapse, however caused, not take action which would *intentionally* damage plaintiff's mine. Taking appellant's contentions singly and without regard to the ungrammatical and meaningless "and/or" by which he separates them, we deal with each.

---

2. Prentice v. Williams, Mo.App., 324 S.W. 2d 466, l. c. 471. American Pamcor, Inc. v. Klote, Mo.App., 438 S.W.2d 287, l. c. 287. Prentice v. Rowe, Mo.App., 324 S.W.2d 457, l. c. 463.

3. Reed v. Steward, Mo., 276 S.W. 12, l. c. 16.

First, as to the claim that plaintiff created the collapse.[4] Defendant's argument is that the "wrongful" act of plaintiff in permitting the surface to fall bars his right to protection by injunctive relief. Plaintiff counters by arguing that it had the right without notification to the defendant to create an air shaft and that because such an air shaft occurred "fortuituously" defendant should not be given the right to invade plaintiff's mine by diverting water therein. Defendant has cited authority for the proposition that where plaintiff's conduct either contributes to cause the injury and is itself unlawful, he cannot seek the aid of equity to restrain concurring conduct which causes the injury. We agree with the general proposition enunciated by these cases, but they do not rule this case.[5] The cause of plaintiff's injury here is not the collapse. The cause of injury here is the independent conduct of the defendant in the creation of the dam and the destruction of the barrier to the entry of the water installed by plaintiff.

■ Defendant is really arguing that the actions of plaintiff in failing to support the surface in April of 1965 bring him within the doctrine of denial of relief by reason of unclean hands. Reed v. Steward, supra. What must be first decided, however, before the application of that rule would bring relief to the defendant here is that even assuming that the plaintiff's actions were either negligent or unlawful, they must relate to the subject matter of litigation. In Kirtz v. Grossman, Mo.App., 463 S.W.2d 541, Judge Clemens, in dealing with the problem of the appointment of a liquidating receiver for a corporation, reached this issue. There the plaintiff had originally participated in an attempt to obtain personal advantage from the sale of the corporation stock and when that failed sought the aid of equity to prevent the application of an unfair plan of dissolution to him. He was granted relief. Judge Clemens points out that the misconduct had ended prior to the commencement of the action in which plaintiff sought relief. The case holds plaintiff's prior misconduct should not bar his right to equitable relief from subsequent action by the defendants. We believe the principles enunciated in this case and in the cases cited therein, St. Louis County v. Litzinger, Mo., 372 S.W.2d 880, and McClure v. Wilson, 238 Mo.App. 824, 185 S.W.2d 878, apply to this litigation. The maxim relied upon by appellant has limitations not only as to subject matter, but as to the time of the conduct of the plaintiff in relation to the filing of the petition.

■ Defendant makes one further contention that there was no evidence of irreparable injury. We reject that contention. The evidence is ample to show that the continued operation of plaintiff's mine, which is its unquestioned right, would be threatened by the continued wrongful action of the defendant.

■ We view the central issue to be determined to be as follows: does the fact that the plaintiff may have either wilfully or negligently acted to create the cave-in bar him from seeking injunctive relief from subsequent wrongful acts by the defendant? Putting the issue in these terms and considering the equitable nature of this proceeding, to ask the question is to answer it. Regardless of the causation of the cave-in, once it had occurred, the defendant was still bound to respect plain-

---

4. Defendant claims two collapses, and the evidence shows a subsequent collapse approximately 200 feet from the initial collapse after water had entered the mine. Plaintiff contends this second collapse was caused by the water defendant contra. In any event, plaintiff has by a judicial tender offered to fill the second collapse, and it is not an issue in this case.

5. Henson v. Payne, Mo.App., 302 S.W.2d 44, 1. c. 49. Skrainka v. Oertel, 14 Mo. App. 474, 1. c. 480.

tiff's rights in the lawful possession of the mine and the underlying minerals. He cannot act in retaliation for what he characterizes as the plaintiff's wrongful action in the creation of the air hole. Whatever may be the result of the litigation between the parties with respect to their respective rights on the issue of surface support, we must determine this case on the basis of the general equitable principles relating to injunctions and the admitted acts of the defendant. Upon this basis, we sustain the action of the court below in the issuance of the injunction and find that there is sufficient evidence to support the findings of fact made by him and that no legal principles prevents or hinders his issuance of the permanent injunction against the defendant. Judgment of the trial court is affirmed.

MAUGHMER, C. concurs.

PER CURIAM:

The foregoing opinion of DIXON, C., is adopted as the opinion of the Court.

CROSS and HOWARD, JJ., and TIMOTHY J. O'LEARY, Special Judge, concur.

SHANGLER, P. J., not participating.